UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| JANE KJTM DOE | Civil Action No. |
| Plaintiff, | Hon. |
| v. | Complaint and Reliance on Jury Demand |
| MICHIGAN STATE UNIVERSITY; THE BOARD OF TRUSTEES OF MICHIGAN STATE UNIVERSITY; LAWRENCE GERARD NASSAR (individual and official capacity); JEFFREY R. KOVAN (individual and official capacity); DOUGLAS DIETZEL (individual and official capacity) GARY STOLLAK (individual and official capacity); DESTINY TEACHNOR-HAUK (individual and official capacity); KATHIE KLAGES (individual and official capacity); and USA GYMNASTICS, INC., | |
| Defendants. | |

_____

E. Powell Miller (P39487)
Marc L. Newman (P51393)
The Miller Law Firm, P.C.
Attorneys For Plaintiff
950 W. University Dr., Suite 300
Rochester, Michigan 48307
248-841-2200
248-652-2852 (fax)
epm@miller.law
mln@millerlawpc.com

Robert C. Hilliard (TX 09677700)
Jessica J. Pritchett (TX 24102377)
Alexander Hilliard (TX 24099145)
HILLIARD MARTINEZ GONZALES, LLP
Attorneys for Plaintiff
719 South Shoreline Blvd.
Corpus Christi, Texas 78401
361-882-1612
361-882-3015 (fax)
bobh@hmglawfirm.com
jpritchett@hmglawfirm.com
alex@hmglawfirm.com
*W.D. Michigan Admission Pending*

_____

# TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT AND INTRODUCTION .................................................1

II.     JURISDICTION AND VENUE .........................................................................................12

III.    PARTIES AND KEY INDIVIDUALS ..............................................................................13

IV.     FACTUAL ALLEGATIONS .............................................................................................17

V.      SPECIFIC FACTUAL ALLEGATIONS ..........................................................................50

        A.      PLAINTFF KJTM DOE .......................................................................................50

VI.     FRAUDULENT CONCEALMENT.....................................................................................51

        A.      DEFENDANT NASSAR .......................................................................................51

        B.      THE MSU DEFENDANTS ...................................................................................58

        C.      DEFENDANT USA GYMNASTICS ...................................................................71

VII.    CLAIMS AGAINST MICHIGAN STATE UNIVERSITY DEFENDANTS AND
        DEFENDANT NASSAR ....................................................................................................76

        A.      COUNT ONE..........................................................................................................76

        B.      COUNT TWO.........................................................................................................81

        C.      COUNT THREE......................................................................................................87

        D.      COUNT FOUR........................................................................................................89

        E.      COUNT FIVE..........................................................................................................91

        F.      COUNT SIX ............................................................................................................92

        G.      COUNT SEVEN .....................................................................................................93

        H.      COUNT EIGHT ......................................................................................................95

        I.      COUNT NINE .........................................................................................................96

        J.      COUNT TEN ...........................................................................................................98

        K.      COUNT ELEVEN ...................................................................................................99

        L.      COUNT TWELVE ................................................................................................100

        M.      COUNT THIRTEEN .............................................................................................101

N.      COUNT FOURTEEN ............................................................................104

VIII.   CLAIMS AGAINST USA GYMNASTICS AND DEFENDANT NASSAR ...............107

A.      COUNT FIFTEEN.............................................................................107

B.      COUNT SIXTEEN ............................................................................109

C.      COUNT SEVENTEEN.......................................................................111

D.      COUNT EIGHTEEN .........................................................................112

E.      COUNT NINETEEN ..........................................................................113

F.      COUNT TWENTY ............................................................................115

G.      COUNT TWENTY-ONE ....................................................................116

H.      COUNT TWENTY-TWO ...................................................................117

J.      COUNT TWENTY-THREE.................................................................118

K.      COUNT TWENTY-FOUR ..................................................................120

L.      COUNT TWENTY-FIVE ...................................................................121

IX.     CLAIMS AGAINST NASSAR .....................................................................123

A.      COUNT TWENTY-SIX .....................................................................123

B.      COUNT TWENTY-SEVEN.................................................................124

C.      COUNT TWENTY-EIGHT.................................................................125

X.      DAMAGES - FOR ALL AFOREMENTIONED CAUSES OF ACTION ....................128

---

## COMPLAINT AND JURY DEMAND

---

NOW COMES Plaintiff Jane KJTM Doe, by and through her attorneys  Robert C. Hilliard, Jessica J. Pritchett, and Alexander Hilliard of Hilliard Martinez Gonzales LLP, and E. Powell Miller and Marc L. Newman of The Miller Law Firm, P.C., and for her Complaint alleges and states as follows:

### I.      PRELIMINARY STATEMENT AND INTRODUCTION

1.      This is a civil action for declaratory, injunctive, equitable, and monetary relief for injuries sustained by Plaintiff as a result of the acts, conduct, and omissions of Lawrence G. Nassar ("Nassar"), Michigan State University ("MSU"), Board of Trustee of Michigan State University ("MSU Trustees"), William D. Strampel ("Strampel"), Jeffrey R. Kovan ("Kovan"), Douglas Dietzel ("Dietzel"), Gary Stollak ("Stollak"), Kathie Klages ("Klages"), Destiny Teachnor-Hauk ("Teachnor-Hauk"), and USA Gymnastics ("USAG"), and their respective employees, representatives, and agents, relating to sexual assault, abuse, molestation, and nonconsensual sexual touching and harassment by Defendant Nassar against Plaintiff, who was a female minor when the sexual assaults took place.

2.      Plaintiff was a young athlete participating in gymnastics.

3.      Plaintiff was a patient of Defendant Nassar when she sought medical treatment for chronic pain or injuries.

4.      Defendant Nassar came highly recommended to Plaintiff as a renowned osteopathic sports medicine physician, purportedly well-respected in the sports medicine

community, and specifically in the gymnastics community as the Team Physician for the United States Gymnastics Team.

5.      Plaintiff and her parents had no reason to suspect Defendant Nassar was anything other than a competent and ethical physician.

6.      From approximately 1996 to 2016, Defendant Nassar worked for Michigan State University in various positions and capacities.

7.      Defendant Nassar worked and treated Plaintiff at Twistars gym in Michigan.

8.      From 1986 to approximately 2015, Defendant Nassar also worked for USA Gymnastics in various positions and capacities.

9.      For over 20 years, Defendant Nassar had unfettered access to young female athletes through the Sports Medicine Clinic at MSU, and through his involvement with USAG and Twistars, who referred athletes to his care.

10.     From approximately 1992 to 1999, under the guise of treatment, Defendant Nassar sexually assaulted, abused, and molested dozens of gymnasts and athletes, most of whom were minors, by nonconsensual vaginal and anal digital penetration without the use of gloves or lubricant.

11.     When the Plaintiff was a patient of Defendant Nassar's, she was seeking treatment for athletic injuries to her lower back, legs, hips, tailbone, ankles, and knees.

12.     Upon information and belief, many other young women, ranging from approximately 6 to 22 years of age were assaulted between 1992 and 2016.

13.     In or around 1997/1998, Larissa Boyce[1] reported to Defendant Kathie Klages her concerns regarding Defendant Nassar's conduct and "treatment".

14.     Defendant Klages dissuaded Larissa Boyce from completing a formal report and warned Boyce that the report would have serious consequences for both Larissa Boyce and Defendant Nassar.

15.     Around the same time, Plaintiff Jane B8 Doe[2] was questioned by Defendant Klages regarding Nassar's "treatment" and plaintiff Jane B8 Doe affirmatively confirmed she had also been sexually assaulted and abused.

16.     Defendant Klages told plaintiff Jane B8 Doe there was no reason to bring up or otherwise report Defendant Nassar's conduct.

17.     In 1999, Christie Achenbach, an MSU student athlete, reported to trainers and her coach Kelli Bert, who were employees of MSU, concerns about Defendant Nassar's conduct and "treatment," yet MSU failed to take any action in response to her complaints.

18.     In 2000, Plaintiff Tiffany Thomas Lopez (formerly Jane T.T. Doe), another MSU student athlete reported to trainers concerns about Defendant Nassar's conduct and "treatment". Yet, again, MSU failed to take any action in response to her complaints.

19.     Many young women were seen alone with only the individual Plaintiff and Defendant Nassar in the room, without chaperones or parents.

20.     At other times, Defendant Nassar would position himself in a manner in which parents or chaperones in the room could not see his conduct.

---

[1] Larissa Boyce is a Plaintiff in member case 1:17-cv-222.
[2] Jane B8 Doe is a Plaintiff in member case 1:17-cv-222.

21.     Because MSU took no action to investigate the 1997/1998, 1999, or 2000 complaints and took no corrective action, from 2000 to 2016, other Plaintiffs, many of whom were minors, were also sexually assaulted, abused, and molested by Defendant Nassar by nonconsensual vaginal and anal digital penetration, nonconsensual sexual touching of the vaginal area without the use of gloves or lubricant, and by nonconsensual touching and groping of their breasts under the guise of treatment.

22.     While most victims were assaulted at MSU, other victims were assaulted at USAG sanctioned events, Twistars, the Suburban Ice Arena, the Michigan Athletic Club, Holt High School, and Defendant Nassar's residence in Holt, Michigan.

23.     Additional complaints regarding Defendant Nassar's conduct surfaced in 2014. Plaintiff Jane D1 Doe[3] reported she had an appointment with Defendant Nassar to address hip pain and was sexually abused and molested by Defendant Nassar when he cupped her buttocks, massaged her breast and vaginal area, and became sexually aroused.[4]

24.     Upon information and belief, Defendant MSU investigated the 2014 complaints through their Office of Institutional Equity, and although Plaintiff Jane D1 Doe reported to Defendant MSU certain facts, some were omitted from the investigative report including but not limited to the following:

---

[3] Jane D1 Doe is a Plaintiff in member case 1:17-cv-254.

[4] *See* Matt Mencarini, *At MSU: Assault, harassment and secrecy*, LANSING STATE JOURNAL (Updated 12:31 p.m. EST Jan. 25, 2018), http://www.lansingstatejournal.com/story/news/local/2016/12/15/michigan-state-sexual-assault-harassment-larry-nassar/94993582/; *see also* Julie Mack, *Who knew what and when about Larry Nassar at Michigan State University*, MICHIGAN NEWS (Updated February 7, 2018 at 12:22 p.m.), http://www.mlive.com/news/index.ssf/2018/02/who_knew_what_when_about_larry.html#incart_m-rpt-2.

- 4 -

a.   Defendant Nassar was sexually aroused while touching her;

b.   The appointment with Defendant Nassar did not end until she physically removed his hands from her body.

25.    Three months after initiating the investigation, in July 2014, Plaintiff Jane D1 Doe's complaints were dismissed and Defendant MSU issued a report to Plaintiff Jane D1 Doe with conclusions that stated:

a.      Plaintiff Jane D1 Doe did not understand the "nuanced difference" between sexual assault and an appropriate medical procedure; and,

b.      Defendant Nassar's conduct was "medically appropriate" and "[n]ot of a sexual nature."[5]

26.    Unbeknownst to Plaintiff Jane D1 Doe, a second report was issued by Defendant MSU regarding Plaintiff Jane D1 Doe's complaints with an entirely different conclusion section which stated:

We cannot find that the conduct was of a sexual nature. Thus, it did not violate the Sexual Harassment Policy. However, we find the claim helpful in that it brought to light some significant problems that the practice will want to address.

We find that whether medically sound or not, the failure to adequately explain procedures such as these invasive, sensitive procedures, is opening the practice up to liability and is exposing patients to unnecessary trauma based on the possibility of perceived inappropriate sexual misconduct. In addition, we find that the failure to obtain consent from patients prior to the procedure is likewise exposing the practice to liability. If procedures can be performed skin-on-skin or over clothes in the breast or pelvic area, it would seem patients have a choice between the two. Having a resident, nurse or someone in the room during sensitive procedures protects doctors and provides patients with peace of mind. If "touching is what DO's do"

---

[5] *Id.*

and that is not commonly known, perhaps the practice will want to consider a disclaimer or information sheet with that information provided to the patient up front.

Finally, we believe that practice should consider whether its procedures for intake of complaints about physicians' behavior is adequate. [Plaintiff Jane D1 Doe] claims she tried to file a complaint with the front desk receptionist, telling her that she was cancelling her appointment because she felt "violated." Whether this triggers a reporting protocol should be examined by the practice.[6]

27.     Following the investigation, upon information and belief Defendant Nassar became subject to new institutional guidelines as follows:

        a.     "We will have another person, (resident, nurse, etc.) in the room whenever we are approaching a patient to preform [sic] procedures of anything close to a sensitive area."

        b.     "The procedure which caused [Plaintiff Jane D1 Doe] emotional distress because of her interpretation will be modified in the future to be sure there is little to no skin to skin contact when in these regions. Should this be absolutely necessary, the procedure will be explained in detail with another person in the room for both the explanation and the procedure."

        c.     "New people in our practice will be oriented to be sure they understand these requirements."[7]

----

[6] *See* Matt Mencarini, *MSU hid full conclusions of 2014 Nassar report from victim*, LANSING STATE JOURNAL, (updated Jan. 26, 2018 at 4:23 p.m. ET), https://www.lansingstatejournal.com/story/news/local/2018/01/26/michigan-state-larry-nassar-title-ix/1069493001/.

[7] *See* Kate Wells, *The secret Nassar report MSU didn't want his abuse victim to see*, MICHIGAN RADIO, (Jan. 26, 2018), http://michiganradio.org/post/secret-nassar-report-msu-didn-t-want-his-abuse-victim-see.

28.    The guidelines were issued by MSU's Dean William  Strampel to Defendant Nassar on or around  July 30, 2014.

29.    After issuing these guidelines to Defendant Nassar, Dean Strampel failed to ensure Defendant Nassar was adhering to the guidelines listed above.

30.    In an interview with Dean Strampel on or around March 14, 2017, Dean Strampel told investigators he did not see the need to follow up with Nassar to ensure that he was following the guidelines listed above.[8]

31.    Consequently, Defendant Nassar continued to treat patients alone.

32.    Defendant Nassar continued to perform the "procedure" without gloves.

33.    Defendant Nassar did not modify the "procedure" to limit skin-to-skin contact.

34.    Following the investigation, between approximately 2014 and 2016, again dozens of Plaintiffs were sexually assaulted by Defendant Nassar.

35.    Through his position with MSU, his notoriety, and support by USAG and Twistars, Defendant Nassar used his position of authority as a medical professional to abuse Plaintiff without any reasonable supervision by MSU or USAG.

36.    Defendant Nassar carried out these acts without fully explaining the "treatment" or obtaining consent of Plaintiff or her parents.

37.    All of Defendant Nassar's acts were conducted under the guise of providing

---

[8] *See* Matt Mencarini, *MSU let Larry Nassar see patients for 16 months during criminal sex assault investigation*, LANSING STATE JOURNAL, (Dec. 20, 2017), https://www.lansingstatejournal.com/story/news/local/2017/12/19/michigan-state-larry-nassar/964034001/ ; *see also* Kate Wells, *Nassar continued to work during MSU police investigation, victims say assaults continued* (Dec. 20, 2017), http://michiganradio.org/post/nassar-continued-work-during-msu-police-investigation-victims-say-assaults-continued.

medical care at his office at MSU, at Twistars, or at USAG sanctioned events.

38.   The failure to give proper notice or to obtain consent for the purported "treatment" from Plaintiff or her parents robbed her of the opportunity to reject the "treatment".

39.   Defendant Nassar used his position of trust and confidence in an abusive manner causing Plaintiff, and multiple other Plaintiffs, to suffer a variety of injuries including shock, humiliation, emotional distress and related physical manifestations thereof, embarrassment, loss of self-esteem, disgrace, and loss of enjoyment of life.

40.   In September 2016, a story was published regarding a complaint filed with Defendant MSU's Police Department titled "Former USA Gymnastics doctor accused of Abuse," which included Plaintiff Rachel Denhollander's allegations against Defendant Nassar.

41.   Following the September 2016 publication, other victims began coming forward after recognizing that they were victims of sexual abuse at a time when most of them were minors.

42.   Plaintiff has been forced to repeatedly relive the trauma of the sexual assaults.

43.   In summer 2015, USAG relieved Defendant Nassar of his duties after becoming aware of concerns about his actions, yet USAG failed to inform MSU of the circumstances regarding his dismissal.

44.   As early as 1997, representatives of MSU were made aware of Defendant Nassar's conduct, yet failed to appropriately respond to allegations, resulting in the sexual assault, abuse, and molestation of multiple Plaintiffs through approximately 2016.

45.   MSU's deliberate indifference before, during, and after the sexual assault, abuse, and molestation of Plaintiffs was in violation of Title IX of the Education Amendments of

1972,  20 U.S.C. § 1681 et seq., 42 U.S. C. § 1983, as well as other Federal and State laws.

46.     The MSU Defendants, as well as USAG, and the USOC's failure to properly supervise Defendant Nassar and their negligence in retaining Defendant Nassar was in breach of their fiduciary duties to Plaintiff with whom they had a special relationship and was in violation of Michigan common law.

47.     In late November 2016, Defendant Nassar was arrested and charged in Ingham County, Michigan on three charges of first-degree criminal sexual conduct with a person under 13, which is a felony punishable with a maximum penalty of imprisonment for life without the possibility of parole.[9]

48.     In mid-December 2016, Defendant Nassar was indicted, arrested, and charged in Federal Court in Grand Rapids, Michigan on charges of possession of child pornography and receipt/attempted receipt of child pornography.

49.     On February 7, 2017, an additional count was added to Defendant Nassar's Federal charges for destruction and concealment of records and tangible objects as Defendant Nassar "caused a third party vendor to permanently delete and destroy all images, records, documents, and drives contained on the hard drive of a laptop computer, and [Defendant Nassar] threw in the trash a number of external hard drives" while under investigation for "his possession of child pornography, his receipt and attempted receipt of child pornography, and his sexual exploitation and attempted sexual exploitation of children."[10]

50.     On February 22, 2017, Defendant Nassar was arraigned on 22 counts of first-

--------------------------

[9] *People v. Nassar*, State of Michigan, Ingham County Circuit Court Case No. 17-143-FC.
[10] W.D. Mich. 1:16-cr-242, ECF 16, PageID.88.

- 9 -

degree criminal sexual conduct with a person under 13 years old, and 14 counts of third-degree criminal sexual conduct with a person under the age of 13 years old in Ingham County, Michigan[11] and Eaton County, Michigan.[12]

51.    On July 10, 2017, Defendant Nassar pled guilty to the Federal charges of possession of child pornography, receipt/attempted receipt of child pornography, and destruction and concealment of records and tangible objects.[13]

52.    On November 22, 2017, Defendant Nassar pled guilty to 7 counts of first-degree criminal sexual conduct in Ingham County, Michigan.

53.    During his Ingham County, Michigan plea, Nassar admitted that his sexual assaults were not done for a medical purpose.

54.    On November 29, 2017, Defendant Nassar pleaded guilty to 3 counts of first-degree criminal sexual conduct in Eaton County, Michigan.

55.    On December 7, 2017, Defendant Nassar was sentenced to a prison term of 720 months (60 years) for the Federal child pornography charges.

56.    From,  January 16, 2018 to  January 24, 2018, a sentencing hearing was held in Ingham County, Michigan for the 7 counts of first-degree criminal sexual conduct to which Defendant Nassar pled guilty.

57.    Dozens of victims and many others provided victim impact statements at the

---

[11]  *People v. Nassar*, Ingham County District Court Case No. 17-00425-FY; *see also* https://www.michigan.gov/documents/ag/Nassar_affidavit_Ingham_County_charges_Feb._2017 _552531_7.pdf

[12]  *People v. Nassar*, Eaton County District Court Case No. 17-0318-FY; *see also* https://www.michigan.gov/documents/ag/Nassar_affidavit_Eaton_County_charges_Feb._2017_5 52536_7.pdf

[13]  1:16-cr-00242, Page ID.114, 119.

Ingham County Sentencing and some of the Plaintiffs who were seeking to proceed anonymously in related litigation chose to publicly identify themselves at the sentencing hearing.

58.    On January 24, 2018, Defendant Nassar was sentenced to a prison term totaling 40 to 175 years for the Ingham County charges.

59.    From January 31, 2018 to February 5, 2018, a sentencing hearing was held in Eaton County, Michigan for the 3 counts of first-degree criminal sexual conduct to which Defendant Nassar pleaded guilty.

60.    Dozens of victims and many others provided victim impact statements at the Eaton County Sentencing and some of the Plaintiffs who were seeking to proceed anonymously in related litigation chose to publicly identify themselves at the sentencing hearing.

61.    On February 5, 2018, Defendant Nassar was sentenced to a 40 to 125 year prison term for the Eaton County charges.

62.    Ultimately, the acts, conduct, and omissions of the MSU Defendants, USA Gymnastics, and their employees, representatives, and agents, and their policies, customs, and practices with respect to investigating sexual assault allegations severely compromised the safety and health of Plaintiff and an unknown number of individuals, and have resulted in repeated instances of sexual assault, abuse, and molestation of multiple Plaintiffs by Defendant Nassar, which has been devastating for Plaintiff and her family.

63.    This action arises from Defendants' blatant disregard for Plaintiff's Federal and state rights, and Defendants' deliberately indifferent and unreasonable response to physician-on-patient/physician-on-student sexual assault, abuse, and molestation.

64.    This action is brought pursuant to Title IX of the Educational Amendments of

1972, 20 U.S.C. § 1681, et seq., as more fully set forth herein.

## II.    JURISDICTION AND VENUE

65.    This is also an action to redress the deprivation of Plaintiff's constitutional rights under the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983.

66.    Subject matter jurisdiction is founded upon 28 U.S.C. § 1331, which gives district courts jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

67.    Subject matter jurisdiction is also founded upon 28 U.S.C. § 1343, which gives district courts original jurisdiction over any civil actions authorized by law to be brought by any person to redress the deprivation, under color of any State Law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States, and any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

68.    Plaintiff further invokes the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367(a) to hear and decide claims arising under state law that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

69.    The claims are cognizable under the United States Constitution, 42 U.S.C. § 1983, 20 U.S.C. § 1681 et seq., and under Michigan law.

70.    The events giving rise to this lawsuit occurred in Ingham County, Michigan and

Eaton County, Michigan both of which sit in the Southern Division of the United States District Court for the Western District of Michigan.

71.    Venue is proper in the United States District Court for the Western District of Michigan, pursuant to 28 U.S.C. § 1391(b)(2), in that this is the judicial district in which the events giving rise to the claims occurred.

72.    Because MSU is a public university organized and existing under  the laws of the State of Michigan, and Michigan statutory law requires parties to file a Notice of Intention to File Claim in order to maintain any action against the state, in satisfaction of M.C.L. § 600.6431, Plaintiff filed a Notice of Intent to File Claim with the Michigan Court of Claims on July 18, 2018. (*See* Notice of Intent to File Claim attached as Exhibit 1).

### III.    PARTIES AND KEY INDIVIDUALS

73.    Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

74.    The name of Plaintiff 'Jane KJTM Doe' has been withheld from this Complaint to protect her identity, and to respect her privacy given the facts and circumstances of this case.[14]

75.    Plaintiff is an adult female and is a resident of Michigan. Plaintiff was a minor at the time she was sexually assaulted, abused, and molested by Defendant Nassar.

76.    Defendant Lawrence "Larry" Nassar, was a Doctor of Osteopathic Medicine, and was a resident of Michigan at all relative times.

77.    Upon information and belief, Defendant Nassar is currently an inmate in the

---

[14] Plaintiff will seek an Order of the Court regarding disclosure of Plaintiff's identity and all conditions for disclosure.

custody of the Federal Bureau of Prisons.

78.     Upon information and belief, Defendant Nassar is currently housed in United States Penitentiary Tucson in Tucson, Arizona serving his Federal sentence.

79.     Defendant Michigan State University (hereinafter, "MSU") was at all relevant times and continues to be a public university organized and existing under the laws of the State of Michigan.

80.     Defendant MSU receives Federal financial assistance and is therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a).

81.     Defendant The Board of Trustees of Michigan State University (hereinafter, "MSU Trustees") is the governing body for  Defendant MSU.

82.     John M. Engler is the former Governor of the State of Michigan and is currently serving as interim President of Defendant MSU.

83.     Lou Anna K. Simon is the immediate past President of Defendant MSU, appointed in approximately January 2005. Prior to her appointment as President, Ms. Simon held several administrative roles including Assistant Provost for General Academic Administration, Associate Provost, and Provost and Vice President for Academic Affairs during her career with MSU.

84.     M. Peter McPherson is a Past President of Defendant MSU and served as President from approximately 1993 to 2004.

85.     Mark Hollis is the immediate past Athletic Director of Defendant MSU. Bill Beekman is currently serving as interim Athletic Director of Defendant MSU.

86.     Defendant Jeffrey R. Kovan, D.O. is or was the Director of Division of Sports Medicine at MSU from 1991 to 1995.

- 14 -

87.     Defendant Douglas Dietzel, D.O. is or was the Clinical Director of MSU Sports Medicine serving in that capacity since approximately 2004 and has also served as Team Orthopedic Surgeon for MSU Department of Intercollegiate Athletics.

88.     Defendant Destiny Teachnor-Hauk is or was an athletic trainer for Defendant MSU for various sports including but not limited to softball, track and field, gymnastics, rowing, and volleyball.

89.     Defendant Gary Stollak, Ph.D., is or was a MSU clinical psychologist and professor of psychology.

90.     Defendant Kathie Klages was the head coach of Defendant MSU's Gymnastics Team/Program from approximately 1990 to 2017, and she conducted classes and programs for children and young adults who were not members of the MSU Gymnastics Team/Program.

91.     Defendants MSU, MSU Trustees, Kovan, Dietzel, Stollak, Klages, Teachnor-Hauk, and Nassar are hereinafter collectively referred to as the MSU Defendants.

92.     Defendant United States of America Gymnastics (hereinafter, "Defendant USAG") was and continues to be an organization incorporated in Indiana, authorized to conduct business and conducting business throughout the United States, including but not limited to Michigan.

93.     USAG advertises on its website: "Since 1990—prior to almost all other National Governing Bodies—USA Gymnastics has provided awareness, prevention and reporting information regarding sexual misconduct to professional members, athlete members and their families."[15]

---

[15] *See* USA GYMNASTICS SAFE SPORT, https://usagym.org/pages/education/safesport/ (last visited July 18, 2018).

94.     Kerry J. Perry is the current President and Chief Executive Officer of Defendant USAG, and has held that position since approximately December 1, 2017.

95.     Steve Penny is the immediate Past President and Chief Executive Officer of Defendant USAG, and held that position from approximately April 2005 to March 16, 2017, and during that time, was responsible for the overall management and strategic planning of Defendant USAG.

96.     Robert Colarossi is a Past President of Defendant USAG and held that position from approximately 1998 to 2005, and during that time, was responsible for the overall management and strategic planning of Defendant USAG.

97.     The entire Board of Directors of Defendant USAG resigned in or about January 2018.

98.     Bela Karolyi is a former Romanian gymnastics coach who defected to the United States in the early 1980's, previously served as National Team Coordinator for Defendant USAG, and trained elite level USAG member gymnasts at a facility operated in the State of Texas.

99.     Marta Karolyi, the wife of Bela Karolyi who also defected to the United States in the early 1980's,  assisted in the operation, management, control, and supervision of the facility operated in the State of Texas where she and her husband trained elite level USAG member gymnasts.

100.    Marta Karolyi is a former National Team Coordinator for the USAG Women's Gymnastics Team.

101.    Valeri Liukin is the immediate past National Team Coordinator for the USAG

Women's Gymnastics Team.

102.   Luan Peszek was employed by Defendant USAG for approximately 30 years and most recently as Vice President of Development. Her employment ended on or about February 28, 2018 on terms currently unknown to Plaintiff.

103.   The United States Olympic Committee, hereinafter "USOC," is the National Olympic Committee for the United States of America charged with overseeing U.S. Teams for the Olympic Games.

104.   The USOC, established under the Ted Stevens Olympic and Amateur Sports Act (36 U.S.C. § 220501, et seq., formerly the Amateur Sports Act of 1978), provides for the National Governing Bodies for each Olympic Sport.

105.   The USOC has designated USAG as the National Governing Body for the Olympic sport of Gymnastics in the United States of America.

## IV.    FACTUAL ALLEGATIONS

106.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

107.   Plaintiff was an elite gymnast and member of USAG.

108.   Plaintiff also competed at USAG events and was associated with the USAG team.

109.   Plaintiff was referred to see Nassar for hip, ankle, knee and back pain.

110.   In approximately 1993 until 1996, Plaintiff was competing in elite USAG gymnastics events and was treated by Defendant Nassar.

111.   Defendant Nassar was on staff with USAG and acting as the USAG team doctor during this time.

- 17 -

112. Under the guise of treatment, Defendant Nassar sexually assaulted, battered, abused, and molested Plaintiff by touching and rubbing her genital area and digitally penetrating her vagina without the use of gloves or lubricant and without Plaintiff's consent or the consent of Plaintiff's parents.

113. In 1996, Plaintiff was approximately 14 years old.

114. Defendant Nassar did not give prior notice of or obtain consent for digital penetration from Plaintiff or her parents.

115. Plaintiff did not treat or intend to treat with Defendant Nassar for Obstetric or Gynecological issues.

116. The conduct by Defendant Nassar was sexual assault, abuse, and molestation and for Defendant Nassar's pleasure and self-gratification because Plaintiff did not consent and the abuse was not medical treatment for Plaintiff's injuries.

117. At all relevant times, Defendants Nassar, Stollak, Kovan, Dietzel, Klages, and Teachnor-Hauk maintained offices at MSU in East Lansing, Michigan.

118. At all relevant times, Defendants MSU, MSU Trustees, Nassar, Stollak, Kovan, Dietzel, Klages, and Teachnor-Hauk were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or Defendant Michigan State University.

119. Defendant Gary Stollak, Ph.D. was employed by the MSU Defendants and served as Professor of Psychology at MSU.

120. Defendant Stollak also provided clinical psychology services while employed by MSU as Professor of Psychology.

- 18 -

121.   Defendant Kovan was the supervisor of the Department of Radiology, under which Defendant Nassar practiced medicine.

122.   Defendant Kathie Klages, as the head coach of the MSU Gymnastics Program, conducted classes and programs for minor children and young adults who were not MSU student athletes.

123.   Defendant Klages regularly referred  MSU student athletes as well as young minor athletes who were not MSU students to Defendant Nassar for medical treatment.

124.   Defendant Destiny Teachnor-Hauk provided athletic training services to MSU student athletes.

125.   Defendant Teachnor-Hauk regularly referred MSU student athletes to Defendant Nassar for medical treatment.

126.   At all relevant times, Defendants Nassar, Stollak, Kovan, Dietzel, Klages, and Teachnor-Hauk were acting in the scope of their employment or agency with Defendant MSU.

127.   At all relevant times, Defendants Nassar, Stollak, Kovan, Dietzel, and Teachnor-Hauk had a special relationship and collegial affiliation with one another as co-employees for Defendant MSU and as fellow medical professionals.

128.   At all relevant times, Defendants Nassar and Klages had a special relationship and collegial affiliation with one another as co-employees for Defendant MSU.

129.   Defendant Nassar graduated from Michigan State University with a Doctor of Osteopathic Medicine in approximately 1993.

130.   Defendant Nassar was employed by and/or an agent of Defendant USAG from approximately 1986 to 2015, serving in various positions, including but not limited to:

    a.      Certified Athletic Trainer;

    b.      Osteopathic Physician;

    c.      National Medical Director;

    d.      National Team Physician, USA Gymnastics; and

    e.      National Team Physician, USA Gymnastics Women's Artistic Gymnastics National Team.

131.    Defendant Nassar was employed by Defendant MSU from approximately 1996 to 2016 in various positions including but not limited to:

    a.      Assistant and/or Associate Professor, Defendant MSU's Division of Sports Medicine, Department of Radiology, College of Osteopathic Medicine;

    b.      Team Physician, Defendant MSU's Men's and Women's Gymnastics Teams;

    c.      Team Physician, Defendant MSU's Men's and Women's Track and Field Teams;

    d.      Team Physician, Defendant MSU's Men's and Women's Crew Teams;

    e.      Team Physician, Defendant MSU's Intercollegiate Athletics Teams;

    f.      Medical Consultant, Defendant MSU's Wharton Center for the Performing Arts;

    g.      Advisor, Student Osteopathic Association of Sports Medicine.

132.    As an Assistant and/or Associate Professor for Defendant MSU Division of Sports Medicine, Defendant Nassar provided medical services for Defendant MSU's Sports

Medicine Clinic.

133.    For over twenty (20) years, Defendant MSU's Sports Medicine Clinic has provided  healthcare to MSU student athletes and others.[16]

134.    When the MSU Defendants operated the MSU Sports Medicine Clinic and provided medical services to Plaintiff, and others, they were acting as an arm of the State.

135.   The MSU Sports Medicine Clinic charged patients, including Plaintiff, for their alleged receipt of medical services.

136.   Charging Plaintiff (and others) and billing insurance companies for medical services is an activity proprietary in nature.

137.   The MSU Defendants charged fees comparable to specialists for the services provided at the MSU Sports Medicine Clinic.[17]

138.   The MSU Sports Medicine Clinic did not provide medical services for the common good of all, but rather for its paying clients.

139.    The MSU Sports Medicine Clinic engaged in proprietary functions by entering into the business of providing medical services for the primary purpose of raising funds and making profit for the MSU Defendants.

140.    The MSU Sports Medicine Clinic cannot be and is not normally supported by taxes and fees.

141.    By seeking medical treatment and services from Defendant MSU's Sports

_____

[16] *See* MSU SPORTS MEDICINE, http://sportsmed.msu.edu/ (last visited July 16, 2018).

[17] *See* MSU SPORTS MEDICINE, PATIENT INFORMATION, http://sportsmed.msu.edu/patients.html. (last visited July 16, 2018).

Medicine Clinic and from Defendant Nassar while in the course of his employment, agency, and/or representation with the MSU Defendants, a special, confidential, and fiduciary relationship existed between Plaintiff, the MSU Defendants, and Defendant Nassar.

142.    Part of Defendant Nassar's employment and contractual duties with MSU, Defendant Nassar was responsible for spending between 50% to 70% of his time engaged in "Outreach" and/or "Public Services."

143.    As part of Defendant Nassar's outreach included providing medical treatment to athletes affiliated with Defendant USAG and Twistars as well as other organizations such as Holt High School.

144.    In order to participate in USAG sanctioned events, it is necessary to be a USAG member.

145.    To obtain membership with USAG, an individual such as Plaintiff, must pay dues.

146.    Similarly, in order for a gymnastics club to be considered a USAG member club, the gymnastics club must also pay dues, and if the member club seeks to hold a USAG sanctioned event at the club, the club must pay a fee.

147.    All those who seek to coach, judge, or participate in USAG sanctioned events must also pay a membership fee.

148.    The exchange of money for membership creates a fiduciary relationship and duty between USAG, their members/athletes, coaches, judges, and their clubs.

149.    USAG regularly recommended Defendant Nassar to its members as a reputable physician.

150.    Club membership in Defendant USAG is a substantial benefit for gymnasts and

- 22 -

gymnastic clubs, as membership with Defendant USAG and participation in Defendant USAG sanctioned events is a considerable factor that interested gymnasts consider in joining a gymnastics club—particularly gymnasts who have collegiate, national, or Olympic aspirations in competitive gymnastics.

151.    Defendant USAG and the USOC had notice of Defendant Nassar's misconduct and propensity to sexually abuse and assault girls and young women in the 1990s.

152.    The relationship between Defendant USAG, Nassar, and MSU was symbiotic in nature, in that the Defendants enjoyed financial benefits from one another and were reliant on one another to continue receiving said benefits.

153.    The MSU Defendants received financial benefits from their relationship with Defendants Nassar, and USAG, including an increased number of patients to the MSU Sports Medicine Clinic, increased billing, revenue, and profit for the MSU Sports Medicine Clinic, and national and international recognition, fame, and prestige.

154.    Defendant Nassar received financial benefits from his relationships with Defendant USAG and the MSU Defendants, including but not limited to an increased number of patients at the MSU Sports Medicine Clinic, additional billing, revenue, and profit for the MSU Sports Medicine Clinic, and national and international recognition, fame, and prestige.

155.    Defendant USAG received financial benefits from its relationship with Defendant MSU, and Defendant Nassar, including but not limited to increased membership in its organization, increased or additional membership fees, and national and international recognition, fame, and prestige.

156.    As a physician of Osteopathic Medicine, Defendant Nassar's medical care and

treatment should have consisted largely of osteopathic adjustments and kinesiology treatment to patients, including students and student-athletes of Defendant MSU.

157.    Defendant Nassar is not, and has never been, a medical doctor of obstetrics or gynecology.

158.    Defendant Nassar is not and has never been trained or certified as a pelvic floor therapist.

159.    While employed by Defendants MSU and USAG, Defendant Nassar practiced medicine at Defendant MSU's Sports Medicine Clinic, a facility at MSU.

160.    During his employment, agency, and representation with the MSU Defendants and Defendant USAG, Defendant Nassar sexually assaulted, abused, and molested Plaintiff by engaging in nonconsensual sexual touching, assault, and harassment including but not limited to digital vaginal penetration.

161.    The State of Michigan's Department of Licensing and Regulatory Affairs Occupational Health Standards regarding Bloodborne Infectious Diseases mandates use of gloves when exposed to potentially infectious material, including vaginal secretions.[18]

162.    Defendant MSU, through its Sports Medicine Clinic and Defendant Nassar, provided medical care and treatment to Plaintiff who was a patient of Defendant Nassar.

163.    Plaintiff was a business invitee at the MSU Sports Medicine Clinic where she was supposed to receive medical care and treatment by Nassar, free of harm.

164.    Defendant MSU is not immune from liability as it failed to warn Plaintiff of the

---

[18] *See* Michigan Administrative Code, R 325.70001, *et seq.*, *available at* https://www.michigan.gov/documents/CIS_WSH_part554_35632_7.pdf.

known or foreseeable dangers related to Defendant Nassar as early as 1996 and failed to train its employees, representatives, and agents about such dangers and to warn and protect Plaintiff from such dangers, and otherwise failed to supervise and train employees of the MSU Sports Medicine Clinic to act in a manner consistent with a reasonably prudent facility.

165. Additionally, Defendant Nassar saw Plaintiff outside of normal business hours at his office at MSU, and sometimes at his residence to gain her trust.

166. Defendant Nassar would regularly and frequently see Plaintiff at Defendant MSU's Sports Medicine Clinic, when she was a minor, without the presence of a chaperone (e.g., parent, guardian, resident, nurse, etc.).

167. Defendant Nassar would communicate via telephone with Plaintiff, when she was a minor often times without including her parents in the communication.

168. Defendants never trained, educated, or warned Plaintiff, who was Defendants' patient and member (respectively) that the actions described above were warning signs for sexual abuse and sexual assault.

169. Because of the special and fiduciary relationship shared between the MSU Defendants, Defendants USAG, and Plaintiff, each Defendant had a legal duty to exercise reasonable care toward Plaintiff, who was their patient and member (respectively).

170. The MSU Defendants and Defendants USAG had a duty to exercise reasonable care in supervising Defendant Nassar while he was their employee or agent.

171. To the best of Plaintiff's knowledge, neither the MSU Defendants, nor Defendant USAG had or enforced a policy that required their patients and members to avoid being seen for treatment at a physician's residence.

- 25 -

172.    To the best of Plaintiff's knowledge, neither the MSU Defendants, nor Defendant USAG, had or enforced a policy that required their patients and members to have the presence of a chaperone (e.g., parent, guardian, resident, nurse, etc.) when treating in a private or sensitive area of the body.

173.    To the best of Plaintiff's knowledge, neither the MSU Defendants, nor Defendant USAG, had or enforced a policy that prohibited their patients from communicating directly with physicians via phone, text message or social media in order to schedule appointments.

174.    Collectively, Defendants' failures as described above left Plaintiff vulnerable and susceptible to sexual assault and abuse.

175.    In or around 1997/1998, Plaintiff Larissa Boyce[19] reported to Defendant Klages, concerns regarding Defendant Nassar's conduct and "treatment".

176.    Defendant Klages dissuaded Plaintiff Boyce from completing a formal report and warned Boyce that the report would have serious consequences for both Plaintiff Boyce and Defendant Nassar.

177.    Around that same time, Plaintiff Jane B8 Doe[20] was questioned by Defendant Klages regarding Nassar's "treatment" and Plaintiff Jane B8 Doe expressly confirmed she had also been sexually assaulted and abused.

178.    Defendant Klages told Plaintiff Jane B8 Doe there was no reason to bring up or otherwise report Defendant Nassar's conduct,

179.    In or around 1999, the MSU Defendants were also put on notice of Defendant

---

[19] Larissa Boyce is a Plaintiff in case 1:17-cv-222.
[20] Jane B8 Doe is a Plaintiff in case 1:17-cv-222.

Nassar's conduct by Jane A19 Doe[21], an MSU student athlete, after she complained to MSU employees, including trainers and her head coach Kelli Bert, that Defendant Nassar touched her vaginal area although she was seeking treatment for an injured hamstring.

180. Despite her complaints to MSU representatives, Jane A19 Doe's concerns and allegations went unaddressed.

181. In approximately 2000, Tiffany Thomas Lopez (formerly Jane T.T. Doe), a female student athlete and member of Defendant MSU's Women's Softball Team, was sexually assaulted and abused during "treatment" by Defendant Nassar and reported Defendant Nassar's conduct to Defendant MSU's employees, including trainers.[22]

182. Ms. Lopez's allegations regarding the sexual assault include the following statements:

Plaintiff is informed and believes, and on that basis alleges, that Defendants knew or should have known that NASSAR had engaged in unlawful sexually-related conduct in the past, and/or was continuing to engage in such conduct. Defendants had a duty to disclose these facts to Plaintiff, her parents and others, but negligently and/or intentionally suppressed, concealed or failed to disclose this information. The duty to disclose this information arose by the special, trusting, confidential, fiduciary relationship between Defendants and Plaintiff. Specifically, the Defendant MSU knew that NASSAR was performing intravaginal adjustments with his bare, ungloved hand and in isolation with young females, based on the following:

a. The Plaintiff, approximately 18 years old at the time, had a visit with NASSAR where he touched her vagina, in order to purportedly heal back pain she was having, under the guise of legitimate medical treatment. The Plaintiff complained to a trainer on her softball team who responded by saying that NASSAR was a world renowned doctor, and that it was legitimate medical treatment. The Plaintiff continued with the purported treatment;

---

[21] Plaintiff A19 Doe is a Plaintiff in case 1:17-cv-00029.

[22] *See* Case No. BC644417, filed with the Superior California Court of the State of California, County of Los Angeles, Dec. 21, 2016.

b. As the purported treatments continued, NASSAR became more bold, having the Plaintiff remove her pants, and then inserting his bare, ungloved and unlubricated hand into her vagina. The Plaintiff, again, reported to Defendant MSU training staff, this time a higher ranking trainer. This trainer told the Plaintiff that the treatment sounded unusual and that the Plaintiff needed to speak to an even higher level trainer in the Department, who ended up being one of three individuals who supervised the entire department at Defendant MSU;

c. When the Plaintiff went to see this individual, the Plaintiff was told by that individual that what happened to the Plaintiff was not sexual abuse, that NASSAR was a world renowned doctor, and that the Plaintiff was not to discuss what happened with NASSAR and was to continue seeing him for purported treatment. The Plaintiff continued to see NASSAR for treatment;

d. Finally, in or around 2001, the Plaintiff refused to continue to see NASSAR for these abusive and invasive procedures. Defendant MSU then pressured and coerced the Plaintiff to declare herself medically inactive. The Plaintiff was shunned from the Defendant MSU sports program, and left Defendant MSU to return home to California.[23]

183.   One of the trainers who Ms. Lopez reported to was Lianna Hadden, who is still presently employed by MSU as an athletic trainer with the volleyball team.

184.   After reporting the assault to Ms. Hadden, Ms. Lopez also reported the assault to Defendant Teachnor-Hauk.

185.   Ms. Lopez told Defendant Teachnor-Hauk that she was "extremely uncomfortable," but Defendant Teachnor-Hauk told Ms. Thomas Lopez that Nassar was engaged in actual medical treatment.

186.   Defendant Teachnor-Hauk also dissuaded Ms. Lopez from further reporting Nassar's conduct by telling Ms. Lopez that if she pursued the matter that it would cast a burden

---

[23] *See id.* at ¶26.

over her family and cause Ms. Lopez a lot of heartache and trauma.

187. Defendant Teachnor-Hauk also defended Nassar by asking Ms. Lopez why she would want to drag Nassar through an allegation of sexual assault.

188. Despite her complaints to the above mentioned MSU employees, agents, and representatives, Ms. Lopez's concerns and allegations went unaddressed in violation of reporting policies and procedures and Title IX and in a manner that was reckless, deliberately indifferent, and grossly negligent.

189. Defendants MSU and Teachnor-Hauk, and other MSU employees and representatives also had the following obligations, among others, pursuant to its Office of Institutional Equity ("OIE") policy:

    a.    "to promptly take steps to investigate or otherwise determine what occurred and then to address instances of relationship violence and sexual misconduct when it knows or should have known about such instances";

    b.    to inform "the MSU Police of all reports it receives regarding sexual assaults";

    c.    to "take immediate steps to initiate the investigatory process to determine what happened and to resolve the matter promptly and equitably";

    d.    to "take prompt, responsive action to support a claimant and take steps to eliminate, prevent, or address a hostile environment if it determines that one exists";

    e.    "to conduct a prompt, adequate, reliable, and impartial investigation to determine what occurred and then to take appropriate steps to resolve the situation when it learns of an incident of sexual misconduct";

- 29 -

  f.  "independently investigate complaints of relationship violence and sexual misconduct";

  g.  to conduct an investigation "by the Office of Institutional Equity under the direction of the Deputy Title IX Coordinator for Investigations"; and

  h.  to promptly report allegations of sexual misconduct "to the Office of Institutional Equity".

190. Upon information and belief, and in violation of Federal law, state law, and the MSU OIE Policy, Defendant MSU failed to take any action in response to the 1997/1998, 1999, and 2000 complaints.

191. Because Defendant MSU took no action to investigate the 1997/1998, 1999, or 2000 complaints and took no corrective action during that time frame, under the guise of medical treatment, dozens of victims and possibly hundreds of others, many of whom were minors, were also sexually assaulted, abused, and molested by Defendant Nassar by vaginal and anal digital penetration, without the use of gloves or lubricant and by touching and groping their breasts.

192. In 2004, Defendant Nassar authored a chapter in Principles of Manual Sports Medicine by Steven J. Karageanes.

193. In the chapter, Defendant Nassar described the pelvic diaphragm, coccyx, and sacroiliac ligaments as an area of the body not fully examined due to its proximity to the genitalia and buttocks, and stated it was "referred to as the 'no fly zone' because of the many cultural stigmas in touching this area."

194. Defendant Nassar recommended taking "special measures to explain any examination and techniques applied in this region," and "warning in advance of what you are

planning to do," among other suggestions.

195.   There is no mention of intravaginal or intra-rectal techniques or procedures in the chapter.

196.   As described in detail below, Defendant Nassar often failed to follow his own recommendations with Plaintiff as:

a.      He did not explain any intravaginal or intra-rectal techniques to Plaintiff or her parents;

b.      He did not obtain proper consent; and,

c.      He did not warn Plaintiff  he was going to engage in vaginal digital penetration before doing so.

197.   In 2004, Brianne Randall reported Defendant Nassar's conduct to her parents and to the Meridian Township Police Department in Meridian Township, Michigan.

198.   In or around 2004, Plaintiff Kyle Stephens, at approximately 12 years of age, who was not a patient of Defendant Nassar, reported inappropriate conduct and touching of a sexual nature by Defendant Nassar to Defendant Stollak who was employed by Defendant MSU.

199.   Consequently, Defendant Stollak had reasonable cause to suspect sexual abuse by Defendant Nassar.

200.   Defendant Stollak was a mandatory reporter.

201.   To the best of Plaintiff's knowledge, Defendant Stollak failed to report Defendant Nassar's conduct to  law enforcement, child protective services, or Defendant MSU.

202.   Instead, Defendant Stollak suggested that Ms. Stephens and her parents meet with Nassar.

- 31 -

203.    Ms. Stephens refused to attend the meeting, but her parents met with Defendant Stollak and Defendant Nassar.

204.    Defendant Stollak's failure to report Defendant Nassar endangered dozens, if not hundreds of victims, who were subsequently abused, assaulted, and molested by Defendant Nassar.

205.    In 2014, following receipt of an unrelated complaint regarding a sexual assault on Defendant MSU's campus, between 2014 and 2015 the U.S. Department of Education's Office of Civil Rights (hereinafter, "OCR") conducted an investigation regarding the complainants' allegations, another complaint regarding sexual assault and retaliation from 2011, and Defendant MSU's response to said complaints, and their general policies, practices, and customs pertaining to their responsibilities under Title IX.[24]

206.    The OCR concluded its investigation in 2015 and presented Defendant MSU with a twenty-one page agreement containing measures and requirements to resolve the 2011 and 2014 complaints and to bring Defendant MSU in compliance with Title IX.[25]

207.    While the OCR was conducting its investigation, additional complaints regarding Defendant Nassar's conduct surfaced in 2014. A victim, Jane D1 Doe, reported she had an appointment with Defendant Nassar to address hip pain and was sexually abused and molested by Defendant Nassar when he cupped her buttocks, massaged her breast and vaginal area, and he

--------

[24] *See Letter from U.S. Department of Education Office for Civil Rights to Michigan State University*, Sept. 1, 2015, OCR Docket #15-11-2098, #15-14-2113 *available at* https://www2.ed.gov/documents/press-releases/michigan-state-letter.pdf.

[25] *See*, Resolution Agreement, Aug. 28, 2015, OCR Document #15-11-2098, #15-14-2133. *available at* https://www2.ed.gov/documents/press-releases/michigan-state-agreement.pdf.

became sexually aroused.[26]

208. Upon information and belief, Defendant MSU investigated the 2014 complaints through their Office of Institutional Equity ("MSU OIE").

209. Plaintiff Jane D1 Doe reported to Defendant MSU facts which were omitted or withheld from the MSU OIE investigative report including, but not limited to, the following:

      a. Defendant Nassar was sexually aroused while touching her;

      b. The appointment with Defendant Nassar did not end until she physically removed his hands from her body.

210. Three months after initiating the investigation, in July 2014, Jane D1 Doe's complaints were dismissed and Defendant MSU determined she didn't understand the "nuanced difference" between sexual assault and an appropriate medical procedure and deemed Defendant Nassar's conduct "medically appropriate" and "[n]ot of a sexual nature."[27]

211. One of the medical experts consulted by the MSU OIE in investigating, Jane D1 Doe's allegations was Defendant Nassar's protégé at MSU, Brooke Lemmen, D.O.

212. Following the investigation, upon information and belief, Defendant Nassar became subject to new institutional guidelines including:

      a. Defendant Nassar was not to examine or treat patients alone but was to be

---

[26] *See* Matt Mencarini, *At MSU: Assault, harassment and secrecy*, LANSING STATE JOURNAL (updated 12:31 p.m. EST Jan. 25, 2018), http://www.lansingstatejournal.com/story/news/local/2016/12/15/michigan-state-sexual-assault-harassment-larry-nassar/94993582/

[27] *Id.*

accompanied by a chaperone such as a resident or nurse;[28]

b.     The alleged "procedure" was to be altered to ensure there would be little to no skin to skin contact when in certain "regions" and if skin to skin contact was "absolutely necessary," the "procedure" was to be explained in detail with another person in the room for both the explanation and the "procedure"; and,

c.     New people in the practice were to be "oriented" to ensure understanding with the guidelines.

213.   Defendants Kovan, and Dietzel failed to supervise, oversee, or otherwise ensure Defendant Nassar was adhering to the conditions listed above.

214.   Upon information and belief, the MSU Defendants failed to take any action to orient new MSU employees to ensure that they were aware of the restrictions placed on Nassar.

215.   In approximately March 2016, Diane Rork was an employee of Defendant MSU employed as a registered medical assistant.[29]

216.   During her employment with Defendant MSU, Diane Rork worked with patients who were seen by Defendant Nassar.

217.   At no point in time was Diane Rork ever told of any restrictions or guidelines regarding Defendant Nassar's treatment of patients.

218.   On one occasion in March 2016, Diane Rork was completing a chart of a girl

---

[28] *Id*.

[29] *See* Kim Kozlowski, *Witness: MSU Knew Nassar Asked Her to Leave Girl's Exam, Kim Kozlowski*, DETROIT NEWS (Dec. 21, 2017), http://www.detroitnews.com/story/news/michigan/2017/12/21/msu-nassar-scandal-witness-claims-retribution/108800992/.

younger than 13 who was set to be examined by Defendant Nassar in an exam room at Defendant MSU's Sports Medicine Clinic.

219.   Defendant Nassar ordered Diane Rork to leave the room so that he could "treat" the young girl alone.

220.   Diane Rork reported her March 2016 interaction with Defendant Nassar to the MSU Police Department in January 2017.

221.   MSU terminated Diane Rork's employment approximately two weeks later.

222.   An unnamed registered nurse employed by MSU at the MSU Sports Medicine Clinic from approximately 2015 to 2016 has indicated that she was never made aware of any restrictions or guidelines concerning Defendant Nassar.

223.   Upon information and belief, the unnamed registered nurse was the only registered nurse employed by Defendant MSU's Sports Medicine Clinic during the time of her employment.

224.   The Michigan State University Police Department ("MSU PD") also investigated the 2014 allegations made by Plaintiff Jane D1 Doe.

225.   Defendant Nassar represented to MSU PD during the 2014 investigation that he was known as "The Dream Builder" and "The Body Whisperer".

226.   Defendant Nassar represented to MSU PD that he felt like he didn't have to go to work, but that he gets to go to work, and that "[i]t just rocks my world."

227.   On or about May 25, 2014 at 9:33 AM, Defendant Nassar sent an email to Dean Strampel expressing concerns that Plaintiff Jane D1 Doe thought he was being too "invasive" into her life and that he thought that she "…may have felt like I [was] 'stalking' her at that

- 35 -

point…"

228.    In or about June 2014, an Ingham County Assistant Prosecuting Attorney recommended to MSU PD detectives that they should interview a non-MSU expert in Defendant Nassar's medical field as further investigation into Plaintiff Jane D1 Doe's allegations.

229.    Upon information and belief, MSU PD and the MSU OIE did not interview any non-MSU experts during the 2014 investigation.

230.    From July 2014 to September 2016, despite complaints about Defendant Nassar's conduct, Defendant MSU continued to permit Defendant Nassar unfettered access to female athletes, including minors, without adequate oversight or supervision to ensure he was complying with the new guidelines.

231.    Defendant Nassar was permitted to return to clinical practice at MSU even though a criminal investigation remained open until approximately December 2015.

232.    At the conclusion of the criminal investigation, on or around December 15, 2015, a representative from Defendant MSU's police department spoke with Defendant Nassar, advised him to thoroughly explain his medical techniques to patients prior to touching them, ensure that they understood, and to have a chaperone in the exam room with him at all times.[30]

233.    Defendant Nassar responded indicating he fully understood and had made that process and procedure his routine since the case evolved.[31]

---

[30]  MSU University Police Department Case Report No. 1758100919 *available at* http://mediad.publicbroadcasting.net/p/michigan/files/201712/fbi_investigation_into_nassar.pdf?_ga=2.158457466.1791923992.1513722353-1282647051.1440964267 (last visited, July 16, 2018).

[31] *Id.*

234. Defendant Nassar's statement to Defendant MSU was completely false, and his statement went unchecked and unverified by the MSU Defendants.[32]

235. At no time during or following the investigation did Defendants MSU, MSU Board of Trustees, Kovan, or Dietzel take any steps to ensure Defendant Nassar was in compliance with the conditions.

236. In or around June 2015, Plaintiff Maggie Nichols and other athletes were overheard discussing Defendant Nassar's misconduct at the Karolyi Ranch.

237. An adult reported Plaintiff Nichols' concerns to USAG.

238. Plaintiff Nichols' complaints were received by former USAG President and CEO Steve Penny and at least one representative of the USOC, among others.

239. Mr. Penny and USAG dissuaded Plaintiff Nichols and her family from pursuing the matter and asked that they refrain from contacting law enforcement.

240. At least five weeks passed before Defendant USAG reported Defendant Nassar to law enforcement.

241. After receiving allegations of what Defendant USAG described as "athlete concerns," in approximately the summer of 2015, Defendant USAG relieved Defendant Nassar

---

[32] *See generally*, specific allegations from Plaintiffs who were sexually abused, assaulted, and molested after July 2014 in W.D. Mich. Case Nos. 1:17-cv-29, 1:17-cv-222, 1:17-cv-244, 1:17-cv-254, 1:17-cv-257, 1:17-cv-288, 1:17-cv-349, 1:17-cv-676, and 1:17-cv-684. Several of the Plaintiffs include allegations that Nassar did not explain his medical techniques, did not have a chaperone in the room such as a resident or nurse during any explanation (of which there usually wasn't an explanation) or during the "procedure."

of his duties.[33]

242.   Defendant Nassar represented publicly that he "retired" from his duties with Defendant USAG.

243.   At no time did Defendant USAG or the USOC inform Defendants MSU, MSU Trustees, or other MSU representatives or Twistars or John Geddert of the concerns that led to Defendant Nassar being relieved from his duties with USAG.

244.   At no time did Defendant USAG or the USOC inform its members, coaches, or the public that Defendant Nassar had been dismissed, relieved from his duties, and was under criminal investigation.

245.   Instead, Defendant USAG and the USOC allowed their members and the public to believe Nassar simply "retired".

246.   While still at MSU, Nassar continued to sexually assault, abuse, and molest young women and girls following his "retirement".

247.   In August 2016, the Indianapolis Star published an article titled, "A blind eye to sex abuse: How USA Gymnastics failed to report cases," the subheading of the article reading, "The prominent Olympic organization failed to alert authorities to many allegations of sexual abuse by coaches." [34]

---

[33] *See* Mark Alesia, Marisa Kwiatkowski and Tim Evans, THE INDIANAPOLIS STAR, *Former USA Gymnastics doctor accused of abuse*, (updated Jan. 24, 2018 4:35 p.m.) *available a*t http://www.indystar.com/story/news/2016/09/12/ former-usa-gymnastics-doctor-accused-abuse/89995734/.

[34] *See* Mark Alesia, Marisa Kwiatkowski and Tim Evans, THE INDIANAPOLIS STAR, *Former USA Gymnastics doctor accused of abuse*, (updated Jan. 24, 2018 4:35 p.m.) *available at*

248.   The article chronicles a history of Defendant USAG's failure to properly report sexual abuse, stating  in part:

> Top executives at one of American's most prominent Organizations failed to alert authorities to many allegations of sexual abuse by coaches – relying on a policy that enabled predators to abuse gymnasts long after USA Gymnastics had received warnings …In 2013 … two former [USAG] officials admitted under oath that the organization routinely dismissed sexual abuse allegations as hearsay unless they came directly from a victim or a victim's parent … records show the organization compiled complaint dossiers on more than 50 coaches and filed them in a drawer in its executive office in Indianapolis … [USAG] compiled confidential sexual misconduct complaint files about 54 coaches over a 10-year period from 1996 to 2006 … It's unclear which, if any, of the complaints in those files were reported to authorities.[35]

249.   Following publication of this article, Plaintiff Rachael Denhollander[36] and a former Olympic gymnast (who was anonymous at the time but has since publicly identified herself as Olympic bronze medalist Jamie Dantzscher) contacted the Indianapolis Star with reports of Defendant Nassar's sexual abuse, assault, and molestation.

250.   Defendant Nassar's employment ended with Defendant MSU on approximately September 20, 2016, only after the MSU Defendants became aware that:

    a.   Defendants Nassar and USAG were sued by a former Olympian who alleged she was sexually assaulted by Defendant Nassar[37]; and,

---

http://www.indystar.com/story/news/2016/09/12/        former-usa-gymnastics-doctor-accused-abuse/89995734/.

[35] *Id*.

[36] Plaintiff Rachael Denhollander is a Plaintiff in Lead Case No. 1:17-00029.

[37] *See* Case No. 34-2016-00200075, filed with the Superior Court of the State of California, County of Sacramento, Sept. 8, 2016. A copy of the Complaint is available at https://www.documentcloud.org/       documents/3106054-JANE-JD-COMPLAINT-Signed.html, (last accessed July 16, 2018)

    b.   A former patient of Defendant Nassar, Plaintiff Rachael Denhollander, filed a criminal complaint with the Michigan State University Police Department alleging Defendant Nassar sexually assaulted her when she was 15 years old and seeking treatment for back pain as a result of gymnastics. Plaintiff Denhollander's allegations of sexual assault by Defendant Nassar included but were not limited to:

        i.   Massaging her genitals;

        ii.   Penetrating her vagina and anus with his finger and thumb; and,

        iii.   Unhooking her bra and massaging her breasts.[38]

251.  Reasons given to Defendant Nassar for his termination included but were not limited to:

    a.   Deviation from "required best practices put in place following the internal sexual harassment investigation conducted … in 2014";

    b.   Failure to disclose a 2004 complaint to Meridian Township Police; and,

    c.   Dishonesty by Defendant Nassar when Defendant MSU questioned him about receiving prior complaints about the "procedure" at issue.

252.  Shortly after Defendant MSU terminated Defendant Nassar's employment, Defendant Klages requested the MSU Women's Gymnastics Team members to sign a card from the team to show their support for Defendant Nassar—despite the fact that Defendant Klages was

---

[38] *See* Mark Alesia, Marisa Kwiatkowski and Tim Evans, THE INDIANAPOLIS STAR, *Former USA Gymnastics doctor accused of abuse*, (updated Jan. 24, 2018 4:35 p.m.) *available a*t http://www.indystar.com/story/news/2016/09/12/ former-usa-gymnastics-doctor-accused-abuse/89995734/.

aware that Defendant Nassar's employment had been terminated due to numerous claims of sexual assault against patients and athletes.[39]

253. Defendant Klages also passionately defended Defendant Nassar to the MSU Women's Gymnastics Team and told her athletes that she would trust her own grandkids with him despite the numerous allegations of sexual assault against Defendant Nassar and the existence of open criminal investigations into his conduct.

254. In September 2016, following Defendant MSU's termination of Defendant Nassar's employment, MSU Athletic Department's Director of Athletic Communications, Jamie Weir Baldwin, instructed members of the MSU Women's Gymnastics Team not to speak to the media or post on their social media accounts regarding Defendant Nassar's actions.

255. Based on the communications of the MSU Athletic Department, members of the MSU Women's Gymnastics Team believed that they would be punished by MSU or face negative consequences if they came forward to the police or media to describe sexual assaults against them.

256. In late November 2016, Defendant Nassar was arrested and charged in Ingham County, Michigan on three charges of First-Degree Criminal Sexual Conduct with a Person Under 13, and was later released on $1,000,000.00 bond.[40]

257. In mid-December 2016, Defendant Nassar was indicted, arrested, and charged in

---

[39] *See* Stephanie Gosk, Kristen Powers, and Tracy Connor, *MSU Abuse Scandal: Coach Had Gymnasts Sign Card for Dr. Larry Nassar* (updated Mar. 21, 2017) *available at* https://www.nbcnews.com/news/us-news/msu-abuse-scandal-coach-had-gymnasts-sign-card-dr-larry-n731781.

[40] State of Michigan, Ingham County Circuit Court Case No. 1603031.

Federal Court in Grand Rapids, Michigan on charges of possession of child pornography and receipt/attempted receipt of child pornography.

258.  According to the Federal indictment,[41] Defendant Nassar:

a.  Knowingly received and attempted to receive child pornography between approximately September 18, 2004 and December 1, 2004;

b.  Knowingly possessed thousands of images of child pornography between approximately February 6, 2003 and September 20, 2016 including images involving a minor who had not attained 12 years of age.

259.  In December 2016, following the filing of Federal child pornography charges against Defendant Nassar, Defendant Klages continued to defend Defendant Nassar and told the parent of at least one of Defendant Nassar's victims that the child pornography "could have been planted" by somebody suing Defendant Nassar.  Defendant Klages also continued to deny that Defendant Nassar had sexually assaulted any patients by suggesting that the victims had "misinterpreted the treatment".

260.  Defendant MSU did not directly encourage the members of the MSU Women's Gymnastics Team to report suspected abuse by Defendant Nassar to the police until February 2017—approximately 5 months after Defendant MSU terminated Defendant Nassar's employment.

261.  In approximately December 2016, Defendant USAG settled one or more claims against it involving allegations of sexual abuse by Defendant Nassar against Olympic gold-

---

[41] 1:16-cr-00242 PageID.1-4.

- 42 -

medal- winning gymnast McKayla Maroney pursuant to a confidential settlement agreement in California.

262. Upon information and belief, Defendant USAG entered into one or more confidential settlement agreements in California involving claims of child sex abuse or other acts that could be prosecuted as a felony sex offense by Defendant Nassar.

263. Notably, California law prohibits confidential settlements in cases involving allegations of child sexual abuse or an act that could be prosecuted as a felony sex offense. CAL. CIV. PROC. CODE § 1002.

264. Upon information and belief, Defendant USAG's settlement agreement with McKayla Maroney is not the first or the only settlement agreement that USAG has entered into to resolve civil claims of victims of sexual abuse by Defendant Nassar against USAG.

265. Testimony given by an FBI agent at a hearing held on December 21, 2016, asserted, among other allegations, that Defendant Nassar used a GoPro camera to record video images of children in a swimming pool and that:

    a. Defendant Nassar's hand can be seen grabbing one girl's hand and shoving it into the vaginal area of another girl; and,[42]

    b. Defendant Nassar's thumb can be seen pressing into a child's vagina/vaginal area.[43]

266. In mid-January 2017, Brooke Lemmen, D.O. submitted a letter of resignation to Dean Strampel amid allegations that she:

---

[42] *Id*. at PageID.49-50.

[43] *Id*. at PageID.50.

    a.   Removed several boxes of confidential patient treatment records from Defendant MSU's Sports Medicine Clinic at Defendant Nassar's request;

    b.   Did not disclose to Defendant MSU that Defendant USAG was investigating Defendant Nassar as of July 2015; and,

    c.   Made a staff member feel pressured not to fully cooperate in an internal investigation into allegations against Defendant Nassar.

267.    On February 7, 2017, a superseding indictment added an additional count of "Destruction and Concealment of Records and Tangible Objects" alleging between September 19, 2016 and September 20, 2016, Defendant Nassar "caused a third-party vendor to permanently delete and destroy all images, records, documents, and files contained on the hard drive of a laptop computer, and the defendant threw in the trash a number of external hard drives."[44]

268.    On or about February 13, 2017, Defendant MSU suspended Defendant Klages from her duties as Head Coach of MSU's Women's Gymnastics Team amid allegations that Defendant Klages received concerns regarding Defendant Nassar's conduct and "treatment" in 1997/1998, yet dissuaded the complainant from formally reporting the abuse, and passionately defended Defendant Nassar when allegations against him surfaced in fall 2016.

269.    Defendant Klages retired from MSU a day after being suspended.

270.    On February 17, 2017, following a Preliminary Examination, Defendant Nassar was ordered to stand trial on three charges of First-Degree Criminal Sexual Conduct with a

---

[44] *Id*. at PageID.88.

Person Under 13 in Ingham County, Michigan following testimony which included, among others, allegations of digital vaginal penetration at Defendant Nassar's residence.

271.   On February 22, 2017, Defendant Nassar was arraigned on 22 counts of First-Degree Criminal Sexual Conduct with a Person Under 13 and 14 counts of Third-Degree Criminal Sexual Conduct with a Person Under the age of 13 in Ingham County, Michigan[45] and Eaton County, Michigan.[46]

272.   In mid-March 2017, Steve Penny resigned as president of Defendant USAG amid allegations that Defendant USAG failed to promptly notify authorities of allegations raised against Defendant Nassar.

273.   Defendant Nassar's Preliminary Examinations on the second set of charges in Ingham County were held on May 12, 2017, May 26, 2017, and June 23, 2017.

274.   At the conclusion of the Preliminary Examination, Defendant Nassar was ordered to stand trial on 12 counts of First-Degree Criminal Sexual Conduct with a Person Under 13 following testimony by Rachael Denhollander and others, which included among others, allegations of digital vaginal penetration by Defendant Nassar.

275.   Defendant Nassar's Preliminary Examination on the charges issued in Eaton County, Michigan was held on June 30, 2017.

276.   At the conclusion of the Preliminary Examination, Defendant Nassar was ordered

---

[45]   *State v. Nassar*, Ingham County District Court Case No. 17-00425; *see also*, http://www.michigan.gov/documents/ag/Nassar_affidavit_Ingham_County_charges_Feb._2017_55 52531_7.pdf

[46]   *State v. Nassar*, Eaton County District Court Case No. 17-0318; *see also*, http://www.michigan.gov/documents/ag/Nassar_affidavit_Eaton_County_charges_Feb._2017_55 2536_7.pdf

- 45 -

to stand trial on 7 counts of First-Degree Criminal Sexual Conduct with a Person Under 13 following testimony, which included among others, allegations of digital vaginal penetration by Defendant Nassar.

277.   On June 26, 2017, Deborah J. Daniels, J.D. released a report titled, "Report to USA Gymnastics on Proposed Policy and Procedural Changes for the Protection of Young Athletes."[47]

278.   Ms. Daniels' report proposed 70 separate policy and procedural changes to Defendant USAG and in a section titled "Overarching Recommendation: Cultural Shift Throughout USA Gymnastics," suggested:

> "USA Gymnastics needs to undergo a complete cultural change, permeating the entire organization and communicated to the field in all its actions. Further, USA Gymnastics needs to take action to ensure that this change in culture also is fully embraced by the clubs that host member coaches, instructors and athletes."[48]

279.   Included within the 70 separate policy and procedural changes suggested by Ms. Daniels were the following recommendations:

a.      Seek Individuals With Expertise in Child Protection for Leadership Team;

b.      Change Culture of Entire Staff to Athlete Safety First;

c.      Provide a Stronger Support System to Athletes;

---

[47] Deborah J. Daniels, J.D., *Report to USA Gymnastics on Proposed Policy and Procedural Changes for the Protection of Young Athletes* (June 26, 2017) available at https://usagym.org/PDFs/About%20USA%20Gymnastics/ddreport_062617.pdf.

[48] *Id.*

     d.      Permit Third-Party Reporting of Policy Violations and Abuse to USA Gymnastics by Third Parties;

     e.      Require Reporting of Abuse and Reporting of Policy Violations;

     f.      Enforce Serious Consequences for Failure to Report Abuse;

     g.      Expand Reporting Methods to Encourage and Facilitate Reporting;

     h.      Accept and Investigate Reports Relating to Misconduct by a Member in Which the Victim is a Non-Member; and,

     i.      Provide Training to All Members and Staff Regarding Reporting Requirements.[49]

280.   To date, it is unknown how many, if any, of the 70 recommendations have been implemented by Defendant USAG or USAG member gyms, coaches, and volunteers.

281.   On July 10, 2017, Defendant Nassar pled guilty to the Federal charges of child pornography, receipt/attempted receipt of child pornography, and destruction and concealment of records and tangible objects.

282.   On November 22, 2017, Defendant Nassar pled guilty to 7 counts of first-degree criminal sexual conduct in Ingham County, Michigan.

283.   On November 29, 2017, Defendant Nassar pled guilty to 3 counts of first-degree criminal sexual conduct in Eaton County, Michigan.

284.   On December 7, 2017 Defendant Nassar was sentenced in Federal Court to a 720 month (60 year) prison term. The sentence included three 240 month (20 year) terms to be served consecutively.

---

[49] *Id.*

285.   From January 16, 2018 to January 24, 2018, a sentencing hearing was held in Ingham County, Michigan for the 7 counts of First-Degree Criminal Sexual Conduct to which Defendant Nassar pled guilty.

286.   From January 31, 2018 to February 5, 2018, a sentencing hearing was held in Eaton County, Michigan for the 3 counts of First-Degree Criminal Sexual Conduct to which Defendant Nassar plead guilty.

287.   Hundreds of Plaintiffs, as well as others who are not Plaintiffs in this litigation, provided victim impact statements at the hearings.

288.   Some of the Plaintiffs who were seeking to proceed anonymously in related litigation chose to publicly identify themselves at the sentencing hearing.

289.   In total, approximately 204 victim impact statements were given over 9 days in two counties.

290.   The first speaker was Plaintiff Kyle Stephens—the last speaker was Plaintiff Rachael Denhollander.  They bookended many victims in this litigation.

291.   On January 24, 2018, Defendant Nassar was sentenced to a 40 to 175 year prison term in Ingham County, Michigan.

292.   On February 5, 2018, Defendant Nassar was sentenced to a 40 to 125 year prison term in Eaton County, Michigan.

293.   During and in the wake of the sentencing hearings:

   a.   Twistars gymnastics club owner John Geddert was suspended by Defendant USAG on or around January 22, 2018, announced his retirement a few days later, and ostensibly transferred ownership and control of Twistars to his wife

- 48 -

Kathryn Geddert;

b.    Ms. Simon resigned as President of Defendant MSU on January 24, 2018;

c.    Mr. Hollis resigned as Athletic Director of Defendant MSU on January 26, 2018;

d.    By January 31, 2018, the entire board of Defendant USAG resigned under threat of decertification by the USOC;

e.    Steps to revoke Dean Strampel's tenure and terminate his employment were initiated on or around February 9, 2018, with Defendant MSU stating publicly, "…Strampel did not act with the level of professionalism we expect from individuals who hold senior leadership positions, particularly in a position that involves student and patient safety…Further allegations have arisen that question whether his personal conduct over a long period of time met MSU's standards."[50];

f.    Scott Blackmun resigned as USOC Chief Executive Officer on February 28, 2018.[51]; and

g.    Numerous other high level officials of Defendant USAG and USOC resigned.

---

[50] *See Engler Takes First step to Remove Strampel*, (Feb. 8, 2018) *available at* http://msutoday.msu.edu/news/2018/engler-takes-first-step-to-remove-strampel/.

[51] A.J. Perez, *U.S. Olympic Committee CEO Scott Blackmun resigns*, THE INDIANAPOLIS STAR, (updated Feb. 28, 2018 at 6:57 p.m.) *available at* https://www.indystar.com/story/sports/olympics/2018/02/28/u-s-olympic-committee-ceo-scott-blackmun-resigns/382569002/.

## V.      SPECIFIC FACTUAL ALLEGATIONS

**A.     PLAINTFF KJTM DOE**

294.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

295.   Plaintiff was an elite gymnast and member of USAG.

296.   From approximately January 1996 to April 1996, Plaintiff, while competing as an elite USAG gymnastics competitor, was treated by Defendant Nassar in his office in Lansing, Michigan.

297.   Defendant Nassar was on staff with Defendant USAG and acting as the USAG team doctor during this time.

298.   Plaintiff presented to Defendant Nassar with complaints of injuries to her back suffered through years of competition.

299.   Under the guise of treatment, Defendant Nassar sexually assaulted, battered, abused, and molested Plaintiff by touching and rubbing her genital area and digitally penetrating her vagina without the use of gloves or lubricant and without Plaintiff's consent or the consent of Plaintiff's parents.

300.   Defendant Nassar, by characterizing his activities as "medical treatments", convinced Plaintiff that his sexual assaults of her were in fact appropriate and necessary to achieve a cure for her medical problems.

301.   Plaintiff was sexually assaulted under the guise of "medical treatments" approximately two times by Defendant Nassar between the time period of January 1996 to April

1996.

302.   During the time period of January 1996 to April 1996, Plaintiff was a minor, and was approximately 14 years old.

303.   Defendant Nassar did not explain his conduct as a medical procedure to Plaintiff.

304.   Defendant Nassar did not give prior notice or obtain consent for digital penetration or to touch Plaintiff's vagina.

305.   Plaintiff did not treat or intend to treat with Defendant Nassar for issues related to obstetrics or gynecology (hereinafter "OB/GYN").

306.   Plaintiff believes the conduct by Defendant Nassar was sexual assault, abuse, and molestation and was perpetrated for Defendant Nassar's pleasure and self-gratification.

## VI.      FRAUDULENT CONCEALMENT

## A.      DEFENDANT NASSAR

307.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

308.   Plaintiff had a special relationship with Defendant Nassar given the physician-patient relationship.

309.   Given the special relationship, Defendant Nassar had an affirmative duty to disclose abuse, and to warn and protect the athletes and patients who sought medical treatment from sexual abuse, assault, and molestation.

310.   Plaintiff hereby alleges that Defendant Nassar committed Fraudulent Concealment by committing Fraud, as described in detail above and below, and by concealing the existence of

Plaintiff's claims and that Plaintiff had a cause of action against Defendant Nassar and/or Defendant MSU at the time his sexual assaults occurred, and by making a material representation(s) to Plaintiff involving a past or existing fact by:

a. making the statement, explaining, that his acts and/or conduct were a "new procedure" which involved vaginal penetration;

b. making the statement, referring to his conduct, disguised as "treatment," as a pelvic adjustment;

c. making the statement, explaining, that his acts and/or conduct was "treatment" and that it was the same that he performed on Olympic athletes; and

d. making the statement, explaining to Plaintiff; that the position of his hand was in an appropriate place, when it was not and while he was digitally penetrating Plaintiff, all which were made contemporaneously and/or shortly after the abrupt, sudden, quick, and unexpected sexual assaults by Defendant Nassar.

311. The material representation(s) to Plaintiff were false, in that Defendant Nassar was actually performing them for his own sexual gratification and pleasure.

312. When Defendant Nassar made the material representation(s), he knew that they were false, in that he knew that the "treatment[s]" were not proper, appropriate, legitimate, and/or considered within the standard of care by any physician of any specialty and/or sports therapist.

313. Defendant Nassar made the material representation(s) with the intent that the material representation(s) should be acted or relied upon by Plaintiff or her parents, such that Plaintiff:

- 52 -

a.  Should believe that the "treatments" were in fact legitimate medical "treatments";

b.  Should believe that the "treatment[s]" were proper, appropriate, and legitimate;

c.  Should not believe that she had been sexually assaulted;

d.  Should not believe that she had been sexually assaulted so that Defendant Nassar could prevent discovery of his sexual assaults;

e.  Should continue the "treatment[s]" so that Defendant Nassar could continue to sexually assault her;

f.  Should not question and/or report the conduct to appropriate authorities; and

g.  Should not reasonably believe and not be aware of a possible cause of action that she had against Defendant Nassar and/or Defendant MSU.

314.  Plaintiff acted in reliance upon the material representation(s), in that Plaintiff, based on Defendant Nassar's representations:

a.  reasonably believed that the "treatments" were in fact "treatments";

b.  reasonably believed that the "treatments" were proper, appropriate, and legitimate;

c.  reasonably did not believe that she had been sexually assaulted;

d.  reasonably believed that she should continue the "treatment[s]";

e.  reasonably did not believe that she should question and/or report the conduct to appropriate authorities; and,

f.  reasonably did not believe that she had and was not aware of a possible cause

of action that she had against Defendant Nassar and/or the MSU Defendants.

315.   Plaintiff thereby suffered injury, in that Plaintiff:

      a.      could not stop the sexual assault;

      b.      continued to undergo the "treatment[s]" and sexual assaults;  and

      c.      suffered pain, discomfort, severe emotional distress, shock, humiliation, fright, grief, embarrassment, loss of self-esteem, disgrace, loss of familial relationships, loss of enjoyment of life and will continue to suffer pain of mind and body, was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earnings and earning capacity; and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

316.   Defendant Nassar concealed the fraud by affirmative act(s) that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that he:

      a.      positioned himself in a manner in which parents or chaperones in the room could not see his conduct, so that he could conceal and prevent discovery of his conduct;

      b.      prevented other medical professionals, chaperones, parents, guardians, and/or caregivers from being in the room during examinations and treatments of Plaintiff so that he could sexually assault Plaintiff; and

c.      did not abide by or follow the standard and care, which requires another medical professional, chaperone, parent, guardian, and/or caregiver be in the room during the examination and treatment of minors and female patients.

317.   The actions and inactions of Defendant Nassar, as described in the preceding paragraphs, constituted Fraudulent Concealment.

318.   At all times pertinent to this action, Defendant Nassar was an agent, apparent agent, servant, and employee of Defendant MSU and operated within the scope of his employment. His wrongful conduct is therefore imputed to Defendant MSU.

319.   At all times material hereto, Plaintiff was entirely free of any negligence contributing to the injuries and damages alleged herein.

320.   Plaintiff did not know, could not have reasonably known, and was reasonably unaware of a possible cause of action that she had against Defendant Nassar and/or Defendant MSU until after Defendant Nassar's February 2018 sentencing hearing or sometime thereafter, for the following reasons among others:

a.      Plaintiff reasonably relied on the Fraud committed by Defendant Nassar by his material representations and concealment of the true nature of his "treatment[s]"and his actions;

b.      Plaintiff was a minor at the time of the assaults and "treatments";

c.      Plaintiff did not know what a legitimate and appropriately performed intra-vaginal treatment was like because she had never experienced and/or had an intra-vaginal treatment before;

d.      Plaintiff had never experienced and/or had an intra-vaginal treatment

before because she had never been treated by a physician and/or therapist that performed them;

e.  Plaintiff did not know what a legitimate and appropriately performed pelvic, vaginal, and/or breast exam was like because she had never experienced and/or had a pelvic, vaginal, and/or breast exam before;

f.  Plaintiff had never experienced and/or had a pelvic and/or vaginal exam before because pelvic and/or vaginal exams are not recommended and routinely performed until a female reaches at least the age of 18 years old, pursuant to longstanding recommendations in the literature, expert opinions, treatment guidelines, and position statements from the American Academy of Pediatrics, American Academy of Family Physicians, American Cancer Society, American College of Obstetricians and Gynecologists, American Society for Clinical Pathology, and American Society for Colposcopy and Cervical Pathology;

g.  Because of these recommendations and never having had one of these treatments or exams, it was very difficult if not impossible for Plaintiff to differentiate a legitimate and appropriately performed intra-vaginal treatment, or pelvic, vaginal, and/or breast exam from a sexual assault;

h.  Plaintiff could not have possibly known because there were no parents, chaperones, guardians, caregivers, and/or other medical

- 56 -

professionals in the room during the "treatments" to observe, question, and/or discover that Defendant Nassar's "treatments" were sexual assaults and inform Plaintiff that she had been sexually assaulted and had a cause of action against Defendant Nassar;

i.   Plaintiff was intimidated by Defendant Nassar's notoriety and reputation and therefore believed his misrepresentations that the "treatment[s]" were legitimate and appropriate;

j.   Plaintiff trusted Defendant Nassar due to his notoriety and reputation;

k.   Plaintiff trusted Defendant Nassar because he groomed her to believe that his "treatments" were legitimate;

l.   Plaintiff had no reason to believe or be aware that she could possibly sue or that she had a possible cause of action because she was a minor and young female who was not knowledgeable or aware of the civil justice system;

m.   Plaintiff had no reason to believe or be aware that she could possibly sue or that she had a possible cause of action because she was a minor and young female who was not knowledgeable or aware of any remedy at law;

n.   Plaintiff had no reason to believe or be aware that she could possibly sue or that she had a possible cause of action evidenced by the fact that so many of her peers had been sexually assaulted by Defendant Nassar over the past few decades, and none of them had a reason to

- 57 -

believe or be aware that they could possibly sue or had a possible cause of action in the past; and none of them ever sued him in the past;

o.      Plaintiff was never told by Defendant Nassar that his conduct was sexual in nature and not legitimate and appropriate "treatment[s]" or for the purpose of concealing the sexual conduct from her parents and others, unlike other victims of sexual abuse who are typically told by their perpetrators that their conduct is of a sexual nature and to conceal the sexual conduct from their parents and others;

p.      Plaintiff was compelled by Defendant Nassar to undergo "treatment[s]" like other athletes if she wanted to continue being involved in gymnastics, therefore the "treatments" were asserted as legitimate and appropriate;

q.      Plaintiff was a minor and young athlete and, therefore she was easily suggestible; and,

r.      Plaintiff had never previously heard about any allegations in the media, or otherwise, regarding sexual assaults or misconduct by Defendant Nassar, or of the kind perpetrated by Defendant Nassar on Plaintiff and others.

## B.      THE MSU DEFENDANTS

321.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

322.   Plaintiff sought treatment at Defendant MSU's Sports Medicine Sports Clinic and was in a special relationship in which MSU was paid or billed for medical treatment.

323.   Given the special relationship, the MSU Defendants had a duty to disclose abuse, and to warn and to protect the athletes who sought treatment at its facility with its doctor.

324.   Plaintiff hereby alleges that Defendant MSU committed Fraudulent Concealment by committing Fraud, and by failing to disclose abuse, warn or protect as described in detail above and below, and concealing the existence of Plaintiff's claims and that Plaintiff had a cause of action against Defendant Nassar and/or the MSU Defendants at the time the sexual assaults were committed by making material representation(s) to Plaintiff.

325.   Defendant MSU's sports medicine trainers, employees, staff, managers, supervisors, directors, agents, apparent agents, and/or servants made material representation(s) to Plaintiff involving a past or existing fact by making statements that:

    a.   Defendant Nassar was an "Olympic doctor" and "knew what he was doing" in regard to performing appropriate "treatments";

    b.   Defendant Nassar was a "world-renowned doctor" and that "it was legitimate medical treatment," in regard to the legitimacy and appropriateness of the "treatments";

    c.   Defendant Nassar's conduct was "not sexual abuse";

    d.   Defendant Nassar was a "world-renowned doctor"; and,

    e.   Defendant Nassar's conduct and "treatment[s]" were "medically appropriate" and "[n]ot of a sexual nature" because the complainant "didn't understand the nuanced difference between sexual assault and an appropriate medical

- 59 -

procedure".

326.   The material representation(s) to Plaintiff was false, in that the MSU Defendants had previously received strikingly similar complaints of abuse by Defendant Nassar from other students and student athletes and knew that the appropriateness of his "treatment[s]" had been questioned in the past.

327.   The MSU Defendants made material representation(s), they knew were false and/or made the material representation(s) recklessly, without any knowledge of their truth and as a positive assertion, in that they knew that Defendant MSU had previously received strikingly similar complaints of abuse by Defendant Nassar from other student, student athletes and non-student athletes, and knew that the appropriateness of his "treatment[s]" had been questioned in the past.

328.   The MSU Defendants made the material representation(s) with the intent that the material representation(s) should be acted upon by Plaintiff, in that Plaintiff:

     a.     Should believe that the "treatments" were in fact "treatments";

     b.     Should believe that the "treatment[s]" were proper, appropriate, and legitimate;

     c.     Should not believe that she had been sexually assaulted;

     d.     Should not believe that she had been sexually assaulted so that it could prevent discovery of Defendant Nassar's sexual assaults;

     e.     Should continue the "treatment[s]" so that Defendant Nassar could continue to sexually assault her;

     f.     Should not question and/or report the conduct to appropriate authorities; and,

g.     Should not reasonably believe and not be aware of a possible cause of action that she had against Defendant Nassar and/or Defendant MSU.

329.   Plaintiff acted in reliance upon the material representation(s), in that Plaintiff:

a.     Reasonably believed that the "treatments" were in fact "treatments";

b.     Reasonably believed that the "treatments" were proper, appropriate, and legitimate;

c.     Reasonably did not believe that she had been sexually assaulted;

d.     Reasonably did not believe that she should continue the "treatment[s]";

e.     Reasonably did not believe that she should question and/or report the conduct to appropriate authorities; and,

f.     Reasonably did not believe that she had and was not aware of a possible cause of action that she had against Defendant Nassar and/or Defendant MSU.

330.   Plaintiff thereby suffered injury, in that Plaintiff:

a.     could not stop the sexual assault;

b.     continued to undergo the "treatment[s]" and sexual assaults; and,

c.     suffered pain, discomfort, severe emotional distress, shock, humiliation, fright, grief, embarrassment, loss of self-esteem, disgrace, loss of familial relationships, loss of enjoyment of life and will continue to suffer pain of mind and body, was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity; and will continue to require treatment,

- 61 -

therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

331.   Defendant MSU concealed abuse through the conduct of its employee, Defendant Nassar.   Defendant Nassar in concealing the fraud by making a fraudulent material representation(s) to Plaintiff that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that he made a material representation(s) to Plaintiff involving a past or existing fact by:

      a.      making the statement, explaining, that his acts and/or conduct were a "new procedure" which involved vaginal penetration;

      b.      making the statement, referring to his conduct, disguised as "treatment," as a pelvic adjustment;

      c.      making the statement, explaining, that his acts and/or conduct was "treatment" and that it was the same that he performed on Olympic athletes; and

      d.      making a statement, explaining to Plaintiff and another medical professional; that the position of his hand was in an appropriate place, when it was not and while he was digitally penetrating Plaintiff, all which were made contemporaneously and/or shortly after the abrupt, sudden, quick, and unexpected sexual assaults by Defendant Nassar.

332.   Defendant Nassar concealed the fraud by an affirmative act(s) that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that he:

      a.      positioned himself in a manner in which parents or chaperones in the room

could not see his conduct, so that he could conceal and prevent discovery of his conduct;

b.    prevented other medical professionals, chaperones, parents, guardians, and/or caregivers from being in the room during examinations and treatments of Plaintiff so that he could sexually assault Plaintiff;

c.    did not abide by or follow the standard and care which requires another medical professional, chaperone, parent, guardian, and/or caregiver be in the room during the examination and treatment of minors and female patients; and

d.    did not abide by or follow the restrictions that had been put into place in 2014 by Defendant MSU restricting his examination and treatment of patients only with another person in the room.

333.   The MSU Defendants concealed the fraud by making a fraudulent material representation(s) to Plaintiff that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that they made a material representation(s) to Plaintiff involving a past or existing fact by:

a.    Making the statement that Defendant Nassar was an "Olympic doctor" and "knew what he was doing" in regard to performing appropriate "treatments";

b.    Making the statement that Defendant Nassar was a "world-renowned doctor" and that "it was legitimate medical treatment," in regard to the legitimacy and appropriateness of the "treatments";

c.    Making the statement that Defendant Nassar's conduct was "not sexual abuse,";

- 63 -

d.    Making the statement that Defendant Nassar was a "world-renowned doctor"; and,

e.    Making the statement that Defendant Nassar's conduct and "treatment[s]" were "medically appropriate" and "[n]ot of a sexual nature" because the complainant "didn't understand the "nuanced difference" between sexual assault and an appropriate medical procedure."

334.   The material representation(s) to Plaintiff were false, in that the MSU Defendants had previously received strikingly similar complaints of abuse by Defendant Nassar from other patients, students, and student athletes and knew that the appropriateness of his "treatment[s]" had been questioned in the past.

335.   When the MSU Defendants made the material representation(s), they knew that they were false and/or made the material representation(s) recklessly, without any knowledge of their truth and as a positive assertion, in that they knew that Defendant MSU had previously received strikingly similar complaints of abuse by Defendant Nassar from other students and student athletes and knew that the appropriateness of his "treatment[s]" had been questioned in the past.

336.   The MSU Defendants made the material representation(s) with the intent that the material representation(s) should be acted upon by Plaintiff, in that Plaintiff:

a.    should believe that the "treatments" were in fact "treatments";

b.    should believe that the "treatment[s]" were proper, appropriate, and legitimate;

c.    should not believe that she had been sexually assaulted;

- 64 -

d.      should not question and/or report the conduct to other authorities; and,

e.      should not reasonably believe and not be aware of a possible cause of action that she had against Defendant Nassar and/or the MSU Defendants.

337.    Plaintiff acted in reliance upon the material representation(s), in that Plaintiff:

a.      reasonably believed that the "treatments" were in fact "treatments";

b.      reasonably believed that the "treatments" were proper, appropriate, and legitimate;

c.      reasonably did not believe that she had been sexually assaulted;

d.      reasonably believed that she should continue the "treatment[s]";

e.      reasonably did not believe that she should question and/or report the conduct to appropriate authorities; and,

f.      reasonably did not believe that she had and were not aware of a possible cause of action that she had against Defendant Nassar and/or Defendant MSU.

338.    Plaintiff thereby suffered injury, in that Plaintiff:

a.      could not stop the sexual assault;

b.      continued to undergo the "treatment[s]" and sexual assaults; and,

c.      suffered pain, discomfort, sleep deprivation, severe emotional distress, shock, humiliation, fright, grief, embarrassment, loss of self-esteem, disgrace, loss of familial relationships, loss of enjoyment of life and will continue to suffer pain of mind and body, was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earnings and earning

capacity.

339.   The MSU Defendants concealed the fraud by affirmative acts that were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that they:

a.   ignored, refused, and failed to inquire, question, and investigate the complaints and take action regarding Defendant Nassar's "treatments";

b.   did not create a policy to require adults, parents, chaperones, guardians, and/or caregivers to be present during an examination of a minor or female by a physician; and,

c.   did not enforce the restrictions that had been put into place in 2014 by Defendant MSU restricting Defendants Nassar's examination and treatment of patients only with another person in the room.

340.   Plaintiff did not know, could not have reasonably known, and was reasonably unaware of a possible cause of action that she had against Defendant Nassar and/or Defendant MSU until after Defendant Nassar's February 2018 sentencing hearing or sometime thereafter, for the following reasons among others:

a.   Plaintiff reasonably relied on the Fraud committed by Defendant Nassar by his material representations and concealment of the true nature of his "treatments[s]"and his actions;

b.   Plaintiff was a minor and/or young female at the time of the assaults and "treatments";

c.   Plaintiff did not know what a legitimate and appropriately performed intra-

vaginal treatment was like because she had never experienced and/or had an intra-vaginal treatment before;

d.      Plaintiff had never experienced and/or had an intra-vaginal treatment before because she had never been treated by a physician and/or therapist that performed them;

e.      Plaintiff did not know what a legitimate and appropriately performed pelvic, vaginal, and/or breast exam was like because she had never experienced and/or had a pelvic, vaginal, and/or breast exam before;

f.      Plaintiff had never experienced and/or had a pelvic and/or vaginal exam before because pelvic and/or vaginal exams are not recommended and routinely performed until a female reaches at least the age of 18 years old, pursuant to longstanding recommendations in the literature, expert opinions, treatment guidelines, and position statements from the American Academy of Pediatrics, American Academy of Family Physicians, American Cancer Society, American College of Obstetricians and Gynecologists, American Society for Clinical Pathology, and American Society for Colposcopy and Cervical Pathology to name a few;

g.      Plaintiff had never experienced and/or had a breast exam before because breast exams are not recommended and routinely performed until a female reaches at least the age of 21 years old, pursuant to longstanding recommendations in the literature, expert opinions, treatment guidelines, and position statements from the American Academy of Pediatrics, American

- 67 -

Academy of Family Physicians, American Cancer Society, American College of Obstetricians and Gynecologists, American Society for Clinical Pathology;

h. Because of these recommendations and never having had one of these treatments or exams, it was very difficult if not impossible for Plaintiff to differentiate a legitimate and appropriately performed intra-vaginal treatment, pelvic, vaginal, and/or breast exam from a sexual assault;

i. Plaintiff could not have possibly known, because there were no parents, chaperones, guardians, caregivers, and/or other medical professionals in the room during the "treatments" to observe, question, and/or discover, that Defendant Nassar's "treatments" were sexual assaults and inform Plaintiff that she had been sexually assaulted and had a cause of action against Defendant Nassar;

j. In the instances where a parent was present in the room, Defendant Nassar's actions to conceal the physical assaults from the view of the parents prevented the parents from discovering that his "treatments" were sexual assaults and from informing Plaintiff that she had been sexually assaulted and had a cause of action against Defendant Nassar or MSU;

k. Plaintiff was intimidated by Defendant Nassar's notoriety and reputation and therefore believed his misrepresentations that the "treatment[s]" were legitimate and appropriate;

l. Plaintiff trusted Defendant Nassar due to his notoriety and reputation;

m. Plaintiff trusted Defendant Nassar because he groomed her to believe that his

"treatments" were in fact legitimate "treatments";

n.  Plaintiff had no reason to believe or be aware that she could possibly sue or had a possible cause of action because she was a minor and young female who was not knowledgeable or aware of the civil justice system;

o.  Plaintiff had no reason to believe or be aware that she could possibly sue or had a possible cause of action because she was a minor and young female who was not knowledgeable or aware of any remedy at law;

p.  Plaintiff had no reason to believe or be aware that she could possibly sue or had a possible cause of action as evidenced by the fact that so many other girls had been sexually assaulted by Defendant Nassar over the past few decades, yet none of them had a reason to believe or be aware that they could possibly sue or had a possible cause of action in the past; and none of them had ever sued him in the past;

q.  Plaintiff was never told by Defendant Nassar that his conduct was sexual in nature and not legitimate and appropriate "treatment[s]" and for the purpose of concealing the sexual conduct from their parents and others, unlike other victims of sexual abuse who are typically told by their perpetrators that their conduct is of a sexual nature and to conceal the sexual conduct from her parents and others;

r.  Plaintiff was compelled by Defendant Nassar to undergo "treatment[s]" like other athletes if she wanted to continue being involved in their relevant sport therefore the "treatments" were legitimate and appropriate;

- 69 -

s.      Plaintiff was a minor and young athlete, therefore she was easily suggestible;

t.      Plaintiff had never previously heard about any allegations in the media regarding sexual assaults or misconduct by Defendant Nassar;

u.      Plaintiff reasonably relied on the Fraud committed by Defendant MSU by their material representations and concealment of the true nature of Defendant Nassar's "treatments[s]"and his actions;

v.      Plaintiff trusted that Defendant MSU would protect Plaintiff from harm and not hire, employee, and/or retain a physician that had, was, or would perform illegitimate and/or inappropriate "treatment[s]," engage in inappropriate conduct, and/or sexually assault patients, students, and/or athletes;

w.      Plaintiff was never told by Defendant MSU that Defendant Nassar's conduct and "treatment[s]" were inappropriate and sexual assaults.  To the contrary Plaintiff was told that Defendant Nassar's conduct and "treatment[s]" were appropriate and legitimate "treatment[s]," "not sexual abuse," "medically appropriate," and "[n]ot of a sexual nature" from a "world-renowned" and "Olympic doctor," who "knew what he was doing" and that Plaintiff, because of her age and inexperience with intra-vaginal treatment, pelvic, vaginal, and/or breast exams, "didn't understand the 'nuanced difference' between sexual assault and an appropriate medical procedure";

x.      Plaintiff reasonably relied on Defendant MSU to protect her; and,

y.      Plaintiff was compelled by Defendant MSU to undergo "treatment[s]" like other athletes if she wanted to continue being involved in gymnastics

therefore the "treatments" were legitimate and appropriate.

341. The actions and inactions of the MSU Defendants and Defendant Nassar, as described in the preceding paragraphs, constituted Fraudulent Concealment.

342. At all times pertinent to this action, Defendant Nassar was an agent, apparent agent, servant, and employee of Defendant MSU and operated within the scope of his employment and his Fraudulent Concealment is imputed to Defendant MSU.

343. The actions and inactions of the sports medicine trainers, employees, staff, managers, supervisors, and directors of the MSU Defendants, as described in the preceding paragraphs, constituted Fraudulent Concealment.

344. At all times pertinent to this action, the sports medicine trainers, employees, staff, managers, supervisors, and directors of Defendant MSU were agents, apparent agents, servants, and employees of Defendant MSU and operated within the scope of their employment and their Fraudulent Concealment is imputed to Defendant MSU.

345. At all times material hereto, Plaintiff was entirely free of any negligence contributing to the injuries and damages hereinafter alleged.

## C.   DEFENDANT USA GYMNASTICS (USAG)

346. Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

347. Plaintiff had a special and fiduciary relationship with Defendant USAG by virtue of being a dues paying member with Defendant USAG.

348. Plaintiff was often under the direct supervision and control of USAG or its agents and was in fact *in loco parentis* with USAG while receiving "treatment" from Defendant Nassar.

349.   Oftentimes while training (including training at the Karolyi Ranch, a USAG sponsored program and sanctioned facility), and while competing at USAG sanctioned events Plaintiff was away from her parents and under the complete care, custody, and control of USAG.

350.   Given the special and fiduciary relationship between Plaintiff and Defendant USAG, Defendant USAG had an affirmative duty to disclose, and to warn and protect their members who sought Defendant Nassar's medical treatment from sexual abuse, assault, and molestation.

351.   Plaintiff was a minor who trusted Defendant USAG which recommended Defendant Nassar to provide her with medical services and who also possessed sensitive and confidential information about her health.

352.   Plaintiff incorporates by reference the Fraud claims made above and below and hereby alleges that Defendant USAG committed Fraudulent Concealment by committing Fraud, as described in detail above and below, and concealing the existence of Plaintiff's claims and that Plaintiff had a cause of action against Defendant Nassar and/or Defendant USAG at the time his sexual assaults occurred by Defendant Nassar making a material representation(s) to Plaintiff involving a past or existing fact by:

     a.    making the statement, explaining that his acts and/or conduct were a "new procedure" which involved vaginal penetration;

     b.    making the statement, referring to his conduct, disguised as "treatment," as a pelvic adjustment;

     c.    making the statement, explaining, that his acts and/or conduct was "checking your sternum";

     d.       making the statement, explaining, that his acts and/or conduct was doing a "breast exam";

     e.       making the statement, explaining, that his acts and/or conduct was "treatment" and that it was the same treatment that he performed on Olympic athletes; and

     f.       making a statement, explaining to Plaintiff and another medical professionals that the position of his hand was in an appropriate place—when it was not— and while he was digitally penetrating Plaintiff, all of which were made contemporaneously and/or shortly after the abrupt, sudden, quick, and unexpected sexual assaults by Defendant Nassar.

353.  The material representation(s) to Plaintiff by Defendant Nassar, MSU and USGA were false, in that he was actually performing them for his own sexual gratification and pleasure.

354.  When Defendant Nassar and USAG made material representation(s), they knew that they were false, in that they knew that the "treatment[s]" were not proper, appropriate, legitimate, and/or considered within standard of care by any physician of any specialty and/or sports therapist;

355.  Defendant Nassar and USAG made the material representation(s) with the intent that the material representation(s) should be acted upon by Plaintiff, in that Plaintiff:

     a.       should believe that the "treatments" were in fact "treatments";

     b.       should believe that the "treatment[s]" were proper, appropriate, and legitimate;

     c.       should not believe that she had been sexually assaulted;

     d.       should not believe that she had been sexually assaulted so that he could

prevent discovery of his sexual assaults;

e.      should continue the "treatment[s]" so that he could continue to sexually assault her;

f.      should not question and/or report the conduct to appropriate authorities; and,

g.      should not reasonably believe and not be aware of a possible cause of action that she had against Defendant Nassar and/or Defendant USAG.

356.   Plaintiff acted in reliance upon Defendant Nassar's and USAG's material representation(s), in that Plaintiff:

a.      reasonably believed that the "treatments" were in fact "treatments";

b.      reasonably believed that the "treatments" were proper, appropriate, and legitimate;

c.      reasonably did not believe that she had been sexually assaulted;

d.      reasonably believed that she should continue the "treatment[s]";

e.      reasonably did not believe that she should question and/or report the conduct to appropriate authorities; and

f.      reasonably did not believe that she had and was not aware of a possible cause of action that she had against Defendant Nassar and/or Defendant USAG.

357.   Plaintiff thereby suffered injury, in that Plaintiff:

a.      could not stop the sexual assault;

b.      continued to undergo the "treatment[s]" and sexual assaults; and,

c.      suffered pain discomfort, severe emotional distress, shock, humiliation, fright, grief, embarrassment, loss of self-esteem, disgrace, loss of familial

relationships, loss of enjoyment of life and will continue to suffer pain of mind and body, was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity; and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

358. Defendant Nassar concealed the fraud by an affirmative act(s) that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that he:

    a.    positioned himself in a manner in which parents or chaperones in the room could not see his conduct, so that he could conceal and prevent discovery of his conduct;

    b.    dismissed a medical professional from the room, during an examination of Plaintiff while he was digitally penetrating Plaintiff, who questioned the placement of his hands;

    c.    prevented other medical professionals, chaperones, parents, guardians, and/or caregivers from being in the room during examinations and treatments of Plaintiff so that he could sexually assault Plaintiff;

    d.    did not abide by or follow the standard and care which requires another medical professional, chaperone, parent, guardian, and/or caregiver be in the room during the examination and treatment of minors and female patients; and

- 75 -

e.      did not abide by or follow Defendant USAG's Code of Ethics, Participant Welfare Policy, Safety/Risk Management Certification, principles in Gymnastics Risk Management Safety Course Handbook, and Prohibited Conduct policy, which he was a part of creating, by not examining patients in the presence of a parent, chaperone, guardian, and/or caregiver.

359.   The actions and inactions of Defendant Nassar and USAG, as described in the preceding paragraphs, constituted Fraudulent Concealment.

360.   At all times pertinent to this action, Defendant Nassar was an agent, apparent agent, servant, and employee of Defendant USAG and operated within the scope of his employment and his Fraudulent Concealment is imputed to Defendant USAG.

361.   At all times material hereto, Plaintiff was entirely free of any negligence contributing to the injuries and damages hereinafter alleged.

## VII.   CLAIMS AGAINST MICHIGAN STATE UNIVERSITY DEFENDANTS AND DEFENDANT NASSAR

## A.      COUNT ONE

### VIOLATIONS OF TITLE IX
### U.S.C. §1681(a), et seq.
### AGAINST DEFENDANTS MSU AND MSU TRUSTEES

362.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

363.   Title IX's statutory language states, "No *person* in the United States shall on the basis of sex, be… subject to discrimination under any education program or activity receiving

- 76 -

Federal financial assistance …"[52]

364.   Plaintiff is a "person" under the Title IX statutory language.

365.   Defendant MSU receives Federal financial assistance for its education program and is therefore subject to the provisions of Title IX of the Education Act of 1972, 20 U.S.C. §1681(a), *et seq.*

366.   Defendant MSU is required under Title IX to investigate allegations of sexual assault, sexual abuse, and sexual harassment.

367.   The U.S. Department of Education's Office of Civil Rights has explained that Title IX covers all programs of a school, and extends to sexual harassment and assault by employees, students and third parties.[53]

368.   Defendant Nassar's actions and conduct were carried out under one of Defendant MSU's programs, which provides medical treatment to students, athletes, and the public.

369.   Defendant Nassar's conduct and actions toward Plaintiff, that being nonconsensual digital vaginal penetration, touching of Plaintiff's vaginal area, and touching of Plaintiff's breasts constitutes sex discrimination under Title IX.

370.   As early as 1997/1998, 1999 and/or 2000, an "appropriate person" at Defendant MSU had actual knowledge of the sexual assault, abuse, and molestation committed by

---

[52] U.S. Dept. of Ed., Office for Civil Rights, *Dear Colleague Letter: Sexual Violence,* n. 11 (Apr. 4, 2011) ("Title IX also protects third parties from sexual harassment or violence in a school's education programs and activities.") *available at* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf

[53] U.S. Dept. of Ed., Office of Civil Rights, *Questions and Answers on Title IX and Sexual Violence* at 1, 3 (Apr. 29, 2014) *available at* https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

Defendant Nassar.

371. Specifically, the MSU Defendants were notified about Defendant Nassar's sexual abuse and molestation by Plaintiffs Larissa Boyce and Jane B8 Doe in or around 1997/1998, Plaintiff Christie Achenbach in or around 1999, and by Tiffany Thomas Lopez in 2000 on more than one occasion.

372. The MSU Defendants failed to carry out their duties to investigate and take corrective action under Title IX following the complaints of sexual assault, abuse, and molestation in or around 1999 and/or 2000.

373. The MSU Defendants were notified again in 2014 of Defendant Nassar's conduct when Plaintiff Jane D1 Doe reported she had an appointment with Defendant Nassar to address hip pain and was sexually abused and molested by Defendant Nassar when he cupped her buttocks, massaged her breast and vaginal area, and he became sexually aroused.[54]

374. Plaintiff Jane D1 Doe reported to Defendant MSU facts which were omitted or withheld from the investigative report including but not limited to the following:

    a.    Defendant Nassar was sexually aroused while touching her;

    b.    The appointment with Defendant Nassar did not end until she physically removed his hands from her body.

375. Three months after initiating an investigation, in July 2014, the victim's complaints were dismissed and Defendant MSU determined she didn't understand the "nuanced

---

[54] *See* Matt Mencarini, *At MSU: Assault, harassment and secrecy*, LANSING STATE JOURNAL (updated 12:31 p.m. EST Jan. 25, 2018), http://www.lansingstatejournal.com/story/news/local/2016/12/15/michigan-state-sexual-assault-harassment-larry-nassar/94993582/.

difference" between sexual assault and an appropriate medical procedure and deemed Defendant Nassar's conduct "medically appropriate" and "Not of a sexual nature."[55]

376. Following the investigation, upon information and belief, Defendant Nassar became subject to new institutional guidelines, one of which – it is believed – was that Defendant Nassar was not to examine or treat patients alone.[56]

377. The MSU Defendants failed to adequately supervise or otherwise ensure Defendant Nassar complied with the newly imposed institutional guidelines even though the MSU Defendants had actual knowledge that Defendant Nassar posed a substantial risk of additional sexual abuse of the females to whom he had unfettered access.

378. After the 2014 complaints, Defendant Nassar continued to sexually assault, abuse, and molest Plaintiffs.

379. The MSU Defendants acted with deliberate indifference to known acts of sexual assault, abuse, and molestation on its premises by:

    a.    failing to investigate and address Plaintiffs Larissa Boyce, Jane B8 Doe, Christie Achenbach, and Tiffany Thomas Lopez's complaints as required by Title IX;

    b.    failing to adequately investigate and address the 2014 complaints regarding Defendant Nassar's conduct; and,

    c.    failing to institute corrective measures to prevent Defendant Nassar from violating and sexually abusing other students and individuals, including

---

[55] *Id.*

[56] *Id.*

minors.

380.   The MSU Defendants acted with deliberate indifference as its lack of response to the allegations of sexual assault, abuse, and molestation was clearly unreasonable in light of the known circumstances, Defendant Nassar's actions with female athletes, and his access to young girls and young women.

381.   The MSU Defendants' deliberate indifference was confirmed by the Department of Education's investigation into Defendant MSU's handling of sexual assault and relationship violence allegations which revealed:

    a.    A sexually hostile environment existed and affected numerous students and staff on Defendant MSU's campus; and

    b.    That the University's failure to address complaints of sexual harassment, including sexual violence in a prompt and equitable manner caused and may have contributed to a continuation of the sexually hostile environment.[57]

382.   The MSU Defendants' responses were clearly unreasonable as Defendant Nassar continued to sexually assault female athletes and other individuals until he was discharged from the University in 2016.

383.   Between approximately 1996 and 2016, the MSU Defendants acted in a deliberate, grossly negligent, and/or reckless manner when they failed to reasonably respond to Defendant Nassar's sexual assaults and sex-based harassment of additional Plaintiffs on and off University

---

[57] *See Letter from U.S. Department of Education Office for Civil Rights, Region XV to Michigan State University*, Sept. 1, 2015, OCR Docket #15-11-2098, #15-14-2113 *available at* https://www2.ed.gov/documents/press-releases/michigan-state-letter.pdf (last visited July 17, 2018).

premises.

384.   The MSU Defendants' failure to promptly and appropriately investigate and remedy and respond to the sexual assaults after they received notice subjected Plaintiff to further harassment as well as a sexually hostile environment—effectively denying her all access to educational opportunities at MSU, including medical care.

385.   As a direct and/or proximate result of the MSU Defendants' actions and/or inactions, Plaintiff has suffered and will continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity; and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

**B.**     **COUNT TWO**

**VIOLATION OF CIVIL RIGHTS**
**42 U.S.C. § 1983**
**U.S. CONST., AMEND XIV**
**AGAINST THE MSU DEFENDANTS AND DEFENDANT NASSAR**

386.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

387.   Plaintiff,  as a female, is a member of a protected class under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

388.   Plaintiff enjoys the constitutionally protected Due Process right to be free from the

- 81 -

invasion of bodily integrity through sexual assault, abuse, or molestation.

389. At all relevant times, Defendants MSU, MSU Trustees, and Nassar were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or Defendant Michigan State University.

390. The acts as alleged above amount to a violation of these clearly established constitutionally protected rights, of which reasonable persons in the MSU Defendants' positions should have known.

391. The MSU Defendants have the ultimate responsibility and authority to train and supervise their employees, agents, and/or representatives, in the appropriate manner of detecting, reporting, and preventing sexual abuse, assault, and molestation and as a matter of acts, custom, policy, and/or practice, failed to do so with deliberate indifference.

392. As a matter of custom, policy, and and/or practice, the MSU Defendants had and have the ultimate responsibility and authority to investigate complaints against their employees, agents, and representatives from all individuals including, but not limited to students, visitors, faculty, staff, or other employees, agents, and/or representatives, and failed to do so with deliberate indifference.

393. At all relevant times, Defendants Dietzel and Kovan acted in a supervisory role to Defendant Nassar through their roles at Defendant MSU's Sports Medicine Clinic, MSU's College of Osteopathic Medicine, and other affiliated MSU departments or institutions.

394. At all relevant times, Defendant Klages, as the head coach of the MSU Women's Gymnastics Team, acted in a supervisory role to Defendant Nassar while he was acting as team physician to the MSU Women's Gymnastics Team.

- 82 -

395.   As a matter of custom, policy, and/or practice, Defendant Klages had the ultimate responsibility and authority to investigate complaints from her athletes that involved allegations of impropriety or sexual assault by her team physician.

396.   As a matter of custom, policy, and/or practice, Defendants Klages, Dietzel, and Kovan had and have the ultimate responsibility and authority to investigate complaints against their employees, agents, and representatives from all individuals including, but not limited to students, patients, visitors, faculty, staff, or other employees, agents, and/or representatives, and failed to do so with deliberate indifference.

397.   Defendant Teachnor-Hauk's actions in assisting to exonerate Defendant Nassar from wrongdoing in response to the 2014 Title IX investigation, her statements to discourage Tiffany Thomas Lopez from pursuing further action against Defendant Nassar, and her statements to law enforcement denying the existence of any prior complaints about Defendant Nassar demonstrate the existence of an agreement or conspiracy between Defendant Nassar and Defendant Teachnor-Hauk to deprive Plaintiff of her constitutional rights.

398.   Defendants Klages, Dietzel, Kovan, Teachnor-Hauk, Stollak, and Nassar had a duty to prevent sexual assault, abuse, and molestation of Defendant MSU's patients, athletes, and other members of the public who utilize Defendant MSU's resources, those duties arising under the above-referenced constitutional rights.

399.   The MSU Defendants had a duty to prevent sexual assault, abuse, and molestation on their campus and premises, that duty arising under the above-referenced constitutional rights, as well as established rights pursuant to Title IX.

400.   Defendant MSU's internal policies provide that "[a]ll University employees ... are

expected to promptly report sexual misconduct or relationship violence that they observe or learn about and that involves a member of the University community (faculty, staff or student) or occurred at a University event or on University property." They state further: "[t]he employee must report all relevant details about the alleged relationship violence or sexual misconduct that occurred on campus or at a campus-sponsored event. . ."

401. Defendant Klages violated the aforementioned internal policies in or around 1997 when Larissa Boyce and other athletes told Defendant Klages that they had been sexually assaulted by Defendant Nassar and Defendant Klages refused to report the incident and instead intimidated, humiliated, and embarrassed Larissa Boyce and other athletes.

402. Defendant Klages's violation of the policy by refusing to take any action in response to legitimate and credible claims of sexual assault by Larissa Boyce and other athletes resulted in continued violations of Plaintiff's and others' constitutional rights, including their Due Process right to bodily integrity, which includes the right to be free from sexual assaults.

403. Defendant Klages's actions as alleged above also demonstrate the existence of an agreement or conspiracy between Defendant Nassar and Defendant Klages to deprive Plaintiff of her constitutional rights.

404. Defendant MSU's aforementioned internal policies were violated in or around 1999 when Christie Achenbach reported sexual assault, abuse, and molestation by Defendant Nassar to MSU representatives including trainers and a coach and no action was taken to address her complaints.

405. Defendant MSU's aforementioned internal policies were violated in 2000 when Tiffany Thomas Lopez reported sexual assault, abuse, and molestation by Defendant Nassar to

MSU representatives including trainers and no action was taken to address her complaints.

406. The MSU Defendants' failure to address Christie Achenbach and Tiffany Thomas Lopez's complaints led to an unknown number of individuals being victimized, sexually assaulted, abused, and molested by Defendant Nassar, including Plaintiff.

407. Defendant MSU's aforementioned internal policies were also violated in or around 2001/2002 when Jennifer Rood Bedford reported sexual assault, abuse, and molestation by Defendant Nassar to Lianna Hadden and other Defendant MSU representatives, including trainers, and no action was taken to address her complaints.

408. Additionally, the MSU Defendants' failure to properly address the 2014 complaint regarding Defendant Nassar's conduct also led to others being victimized, sexually assaulted, abused and molested by Defendant Nassar, including Plaintiff.

409. At all relevant times, Defendant MSU had a policy requiring MSU employees to immediately report suspected child abuse, sexual assault, and child pornography.[58]

410. Defendant Klages violated this policy in or around 1997.

411. Defendant Teachnor-Hauk violated this policy in or around 2000.

412. Defendant Stollak violated this policy in or around 2004.

413. Ultimately, Defendants failed to adequately and properly investigate the

---

[58] *See* Brandon Howell, *President Lou Anna K. Simon reminds Michigan State employees of obligation to report sexual assault* (Aug. 17, 2012) *available at* https://www.mlive.com/lansing-news/index.ssf/2012/08/president_lou_anna_k_simon_rem.html ("Simon writes in the e-mail … 'I write to remind University employees about the reporting protocols for suspected child abuse, child pornography, and allegations of sexual assault.' Jason Cody, a spokesperson for the university said the protocols outlined in Simon's email 'long have been in place for employees.'").

complaints of Plaintiff or other similarly-situated individuals including but not limited to failing to:

      a.      perform a thorough investigation into improper conduct by Defendant Nassar after receiving complaints in 1999 and 2000;

      b.      thoroughly review and investigate all policies, practices, procedures and training materials related to the circumstances surrounding the conduct of Defendant Nassar;

      c.      recognize sexual assault when reported in the 1990s and in 2014 and permitting University officials to deem sexual assault as "medically appropriate" and "not of a sexual nature"; and,

      d.      ensure compliance with all institutional guidelines issued following the 2014 investigation into Defendant Nassar.

414.  As indicated in the U.S. Department of Education Office of Civil Rights report,[59] the MSU Defendants fostered a culture that permitted a sexually hostile environment to exist, affecting numerous individuals on Defendant MSU's campus, including Plaintiff.

415.  Also indicated in the report was Defendant MSU's custom, practice, and/or policy of failing to address complaints of sexual harassment, including sexual violence in a prompt and equitable manner, which caused and may have contributed to a continuation of the sexually hostile environment.

_____

[59] *See Letter from U.S. Department of Education Office for Civil Rights to Michigan State University,* Sept. 1, 2015, OCR Docket #15-11-2098, #15-14-2113 *available at* https://www2.ed.gov/documents/press-releases/michigan-state-letter.pdf, (last visited July 16, 2018).

416.   By failing to prevent the aforementioned sexual assault, abuse, and molestation upon Plaintiff, and by failing to appropriately respond to reports of Defendant Nassar's sexual assault, abuse, and molestation in a manner that was so clearly unreasonable it amounted to deliberate indifference, the MSU Defendants are liable to Plaintiff pursuant to 42 U.S.C. §1983.

417.   The MSU Defendants are also liable to Plaintiff under 42 U.S.C. §1983 for maintaining customs, policies, and practices that deprived Plaintiff of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. §1983.

418.   The MSU Defendants tolerated, authorized and/or permitted a custom, policy, practice or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline Defendant Nassar, with the result that Defendant Nassar was allowed to violate the rights of persons such as Plaintiff with impunity.

419.   As a direct and/or proximate result of the MSU Defendants' actions and/or inactions, Plaintiff suffered pain, discomfort, and will continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity.

C.   **COUNT THREE**

**FAILURE TO TRAIN AND SUPERVISE**
**42 U.S.C. § 1983**
**AGAINST THE MSU DEFENDANTS**

420.   Plaintiff realleges and incorporates by reference the allegations contained in the

- 87 -

previous paragraphs.

421.    The MSU Defendants have the ultimate responsibility and authority to train and supervise their employees, agents, and/or representatives including Defendant Nassar and all faculty and staff in their duties toward students, faculty, staff, and visitors.

422.    The MSU Defendants failed to train and supervise its employees, agents, and/or representatives, including all faculty and staff, regarding the following duties:

      a.      Perceive, report, and stop inappropriate sexual conduct on campus;

      b.      Provide diligent supervision over student-athletes and other individuals;

      c.      Report suspected incidents of sexual abuse or sexual assault;

      d.      Ensure the safety of all students, faculty, staff, and visitors to Defendant MSU's campuses premises;

      e.      Provide a safe environment for all students, faculty, staff, and visitors to Defendant MSU's premises free from sexual harassment; and,

      f.      Properly train faculty and staff to be aware of their individual responsibility for creating and maintaining a safe environment.

423.    The above list of duties is not exhaustive.

424.    The MSU Defendants failed to adequately train coaches, trainers, medical staff, and others regarding the aforementioned duties, which led to violations of Plaintiff's rights.

425.    As a result, the MSU Defendants deprived Plaintiff of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

426.    As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiff  suffered pain, discomfort and will continue to suffer pain of mind and body, shock,

emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, was prevented and will continue to be prevented from performing Plaintiff's  daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity; and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

**D.     COUNT FOUR**

**GROSS NEGLIGENCE**
**AGAINST THE MSU DEFENDANTS AND DEFENDANT NASSAR**

427.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

428.   The MSU Defendants owed Plaintiff a duty to use due care to ensure her safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, representatives, and/or agents, including Defendant Nassar.

429.   Defendant Nassar owed Plaintiff a duty of due care in carrying out medical treatment as an employee, agent, and/or representative of the MSU Defendants.

430.   By seeking medical treatment from Defendant Nassar in the course of his employment, agency, and/or representation of the MSU Defendants, a special, confidential, and fiduciary relationship between Plaintiff and Defendant Nassar was created, resulting in Defendant Nassar owing Plaintiff a duty to use due care.

431. The MSU Defendants' failure to adequately supervise Defendant Nassar, especially after MSU knew or should have known of complaints regarding his nonconsensual sexual touching and assaults during "treatments" was so reckless as to demonstrate a substantial

lack of concern for whether an injury would result to Plaintiff.

432.   Defendant Nassar's conduct in sexually assaulting, abusing, and molesting Plaintiff in the course of his employment, agency, and/or representation of the MSU Defendants and under the guise of rendering "medical treatment" was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff.

433.   The MSU Defendants' conduct demonstrated a willful disregard for precautions to ensure Plaintiff's safety.

434.   The MSU Defendants' conduct as described above, demonstrated a willful disregard for substantial risks to Plaintiff.

435.   The MSU Defendants breached duties owed to Plaintiff and were grossly negligent when they conducted themselves by the actions described above, said acts having been committed with reckless disregard for Plaintiff's health, safety, constitutional and/or statutory rights, and with a substantial lack of concern as to whether an injury would result.

436.   As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiff suffered pain, discomfort, and will continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity; and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

E.      COUNT FIVE

## NEGLIGENCE
## AGAINST THE MSU DEFENDANTS AND DEFENDANT NASSAR

437.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

438.   The MSU Defendants owed Plaintiff a duty of ordinary care to ensure their safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, representatives and/or agents.

439.   By seeking medical treatment from Defendant Nassar in his capacity as an employee, agent, and/or representative of the MSU Defendants, a special, confidential, and fiduciary relationship between Plaintiff and Defendant Nassar was created, resulting in Defendant Nassar owing Plaintiff a duty to use ordinary care.

440.   Defendant Nassar owed Plaintiff a duty of ordinary care.

441.   The MSU Defendants' failure to adequately train and supervise Defendant Nassar breached the duty of ordinary care.

442.   The MSU Defendants had notice through its own employees, agents, and/or representatives as early as 1999, again in 2000, and again in 2014 of complaints of a sexual nature related to Defendant Nassar's purported "treatments" with young girls and women.

443.   The MSU Defendants should have known of the foreseeability of sexual abuse with respect to youth and collegiate gymnastics.

444.   The MSU Defendants' failure to properly investigate, address, and remedy complaints regarding Defendant Nassar's conduct was a breach of ordinary care.

445.   Defendant Nassar's conduct in sexually assaulting, abusing, and molesting

Plaintiff  in the course of his employment, agency, and/or representation of the MSU Defendants was a breach of the duty to use ordinary care.

446.   As a direct and/or proximate result of Defendants' conduct, actions and/or inactions, Plaintiff suffered pain, discomfort, and will continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity; and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

## F.      COUNT SIX

### VICARIOUS LIABILITY
### AGAINST THE MSU DEFENDANTS

447.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

448.   Vicarious liability is indirect responsibility imposed by operation of law where an employer is bound to keep its employees within their proper bounds and is responsible if it fails to do so.

449.   Vicarious liability essentially creates agency between the principal and its agent, so that the principal is held to have done what the agent has done.

450.   The MSU Defendants employed and/or held Defendant Nassar out to be its agent and/or representative from approximately 1996 to 2016.

451.   Defendant MSU's website contains hundreds of pages portraying Defendant

Nassar as a distinguished member of Defendant MSU's College of Osteopathic Medicine, Division of Sports Medicine.[60]

452.   The MSU Defendants are vicariously liable for the actions of Defendant Nassar as described above that were performed during the course of his employment, representation, and/or agency with the MSU Defendants and while he had unfettered access to young female athletes on MSU's campus and premises through its College of Osteopathic Medicine and Division of Sports Medicine.

453.   As a direct and/or proximate result of Defendant Nassar's actions carried out in the course of his employment, agency, and/or representation of the MSU Defendants, Plaintiff suffered pain, discomfort, and will continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity; and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

G.   COUNT SEVEN

EXPRESS/IMPLIED AGENCY
AGAINST THE MSU DEFENDANTS

454.   Plaintiff realleges and incorporates by reference the allegations contained in the

---

[60] As of July 16, 2018, using the search term "Nassar" at www.msu.edu returns 1,240 results, many of which include references to Defendant Nassar dating as far back as 1997.

previous paragraphs.

455.   An agent is a person who is authorized by another to act on its behalf.

456.   The MSU Defendants intentionally or negligently made representations that Defendant Nassar was their employee, agent, and/or representative.

457.   On the basis of those representations, Plaintiff reasonably believed that Defendant Nassar was acting as an employee, agent, and/or representative of the MSU Defendants.

458.   Plaintiff was injured as a result of Defendant Nassar's sexual assault, abuse, and molestation as described above, acts that were performed during the course of his employment, agency, and/or representation with the MSU Defendants and while he had unfettered access to young female athletes.

459.   Plaintiff was injured because she relied on the MSU Defendants to provide employees, agents, and or representatives who would exercise reasonable skill and care.

460.   As a direct and/or proximate cause of Defendant Nassar's negligence carried out in the course of his employment, agency, and/or representation of the MSU Defendants, Plaintiff suffered pain, discomfort, and will continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity; and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

**H.      COUNT EIGHT**

**NEGLIGENT SUPERVISION
AGAINST THE MSU DEFENDANTS**

461.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

462.   The MSU Defendants had a duty to provide reasonable supervision of their employee, agent, and/or representative, Defendant Nassar, while he was in the course of his employment, agency or representation with the MSU Defendants and while he interacted with young female athletes including Plaintiff.

463.   It was reasonably foreseeable given the known sexual abuse in youth sports and gymnastics, and in particular, that Defendant Nassar who had prior allegations against him had or would sexually abuse children, including Plaintiff, unless properly supervised.

464.   The MSU Defendants by and through their employees, agents, managers and/or assigns, such as President Simon, President McPherson, Defendant or Defendant Kovan knew or reasonably should have known of Defendant Nassar's conduct and/or that Defendant Nassar was an unfit employee, agent, and/or representative because of his sexual interest in children.

465.   The MSU Defendants breached their duty to provide reasonable supervision of Defendant Nassar, and permitted Defendant Nassar, who was in a position of trust and authority, to commit wrongful acts against Plaintiff.

466.   The aforementioned sexual abuse occurred while Plaintiff and Defendant Nassar were on the premises of Defendant MSU, and while Defendant Nassar was acting in the course of his employment, agency, and/or representation of the MSU Defendants.

- 95 -

467.   The MSU Defendants tolerated, authorized and/or permitted a custom, policy, practice or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline such individuals, with the result that Defendant Nassar was allowed to violate the rights of persons such as Plaintiff with impunity.

468.   As a direct and/or proximate result of the MSU Defendants' negligent supervision, Plaintiff suffered pain, discomfort, and will continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity; and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

I.   **COUNT NINE**

**NEGLIGENT FAILURE TO WARN OR PROTECT**
**AGAINST THE MSU DEFENDANTS**

469.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

470.   The MSU Defendants knew or should have known that Defendant Nassar posed a risk of harm to Plaintiff or those in Plaintiff's situation.

471.   As early as 1997/1998, the MSU Defendants had direct and/or constructive knowledge as to the dangerous conduct of Defendant Nassar and failed to act reasonably and responsibly in response to that knowledge.

472.   The MSU Defendants knew or should have known that Defendant Nassar

committed sexual assault, abuse, and molestation and/or was continuing to engage in such conduct.

473.    The MSU Defendants had a duty to warn or protect Plaintiff and others in Plaintiff's situation against the risk of injury by Defendant Nassar.

474.    The duty to disclose this information arose by the special, trusting, confidential, and fiduciary relationship between Defendant Nassar as an employee, agent, and or representative of the MSU Defendants and Plaintiff.

475.    The MSU Defendants breached said duty by failing to warn Plaintiff and/or by failing to take reasonable steps to protect Plaintiff from Defendant Nassar.

476.    The MSU Defendants breached their duties to protect Plaintiff by failing to:

     a.    respond to allegations of sexual assault, abuse, and molestation;

     b.    detect and/or uncover evidence of sexual assault, abuse, and molestation; and,

     c.    investigate, adjudicate, and terminate Defendant Nassar's employment with Defendant MSU prior to 2016.

477.    The MSU Defendants failed to adequately screen, counsel and/or discipline Defendant Nassar for physical and/or mental conditions that might have rendered him unfit to discharge the duties and responsibilities of a physician at an educational institution, resulting in violations of Plaintiff's rights.

478.    The MSU Defendants willfully refused to notify, give adequate warning, and implement appropriate safeguards to protect Plaintiff from Defendant Nassar's conduct.

479.    As a direct and/or proximate result of the MSU Defendants negligent failure to

warn or protect, Plaintiff suffered pain, discomfort, and will continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity; and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

**J.      COUNT TEN**

**NEGLIGENT FAILURE TO TRAIN OR EDUCATE
AGAINST THE MSU DEFENDANTS**

480.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

481.   The MSU Defendants breached their duty to take reasonable protective measures to protect Plaintiff and other minors from the risk of childhood sexual abuse and/or sexual assault by Defendant Nassar, such as the failure to properly train or educate Plaintiff and other individuals (including minors) about how to avoid such a risk or recognize such conduct.

482.   The MSU Defendants failed to implement reasonable safeguards to:

a.      Prevent acts of sexual assault, abuse, and molestation by Defendant Nassar; and

b.      Avoid placing Defendant Nassar in positions where he would have unsupervised contact and interaction with Plaintiff and other young athletes.

483.   As a direct and/or proximate result of the MSU Defendants' negligent failure to train or educate, Plaintiff suffered pain, discomfort, and will continue to suffer pain of mind and

body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life, and has sustained and continue to sustain loss of earnings and earning capacity; and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

**K.      COUNT ELEVEN**

**NEGLIGENT RETENTION**
**AGAINST THE MSU DEFENDANTS**

484.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

485.   The MSU Defendants had a duty when credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising employees, agents and/or representatives to exercise due care, but they failed to do so.

486.   The MSU Defendants were negligent in the retention of Defendant Nassar as an employee, agent, and/or representative in their failure to adequately investigate, report and address complaints about his conduct of which they knew or should have known.

487.   The MSU Defendants were negligent in the retention of Defendant Nassar as an employee, agent, and/or representative when, after they discovered or reasonably should have discovered Defendant Nassar's conduct which reflected a propensity for sexual misconduct, they continued to retain him.

488.   The MSU Defendants' failure to act in accordance with the standard of care

resulted in Defendant Nassar gaining access to and sexually abusing and/or sexually assaulting Plaintiff and an unknown number of other individuals.

489.   The aforementioned negligence in the credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising of Defendant Nassar created a foreseeable risk of harm to Plaintiff as well as other minors and young adults.

490.   As a direct and/or proximate result of the MSU Defendants' negligent retention, Plaintiff suffered discomfort, and will continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; and has sustained and will continue to sustain loss of earnings and earning capacity; and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

**L.     COUNT TWELVE**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
AGAINST THE MSU DEFENDANTS**

491.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

492.   The MSU Defendants allowed Defendant Nassar to be in a position where he could sexually assault, abuse, and molest children and young adults.

493.   A reasonable person would not expect the MSU Defendants to tolerate or permit their employee or agent to carry out sexual assault, abuse, or molestation after they knew or

should have known of complaints and claims of sexual assault and abuse occurring during Defendant Nassar's "treatments."

494.   The MSU Defendants held Defendant Nassar in high esteem and acclaim which in turn encouraged Plaintiff and others to respect and trust Defendant Nassar, seek out his services and to not question his methods or motives.

495.   The MSU Defendants protected Defendant Nassar in part to bolster and sustain his national and international reputation in the gymnastics community.

496.   A reasonable person would not expect the MSU Defendants to be incapable of supervising Defendant Nassar and/or preventing Defendant Nassar from committing acts of sexual assault, abuse, and molestation.

497.   The MSU Defendants' conduct as described above was intentional and/or reckless.

498.   As a direct and/or proximate result of the MSU Defendants' conduct, Plaintiff suffered pain, discomfort, and will continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity; and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

**M.    COUNT THIRTEEN**

**FRAUD AND MISREPRESENTATION**

**AGAINST THE MSU DEFENDANTS**

499.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

500.   From  approximately 1996 to September 2016, the MSU Defendants represented to Plaintiff and the public that Defendant Nassar was a competent and safe physician.

501.   By representing that Defendant Nassar was a team physician and athletic physician at Defendant MSU and a National Team Physician with Defendant USAG, the MSU Defendants represented to Plaintiff and the public that Defendant Nassar was safe, trustworthy, of high moral and ethical repute, and that Plaintiff and the public need not worry about being harmed by Defendant Nassar.

502.   The representations were false when they were made as Defendant Nassar had and was continuing to sexually assault, abuse, and molest Plaintiff and an unknown number of other individuals.

503.   As of 1999 and 2000, the MSU Defendants knew their representations of Defendant Nassar were false as at least Christie Achenbach and Tiffany Thomas Lopez had complained of Defendant Nassar's conduct to MSU representatives.

504.   Although MSU was informed of Defendant Nassar's conduct, it failed to investigate, remedy, or in any way address Christie Achenbach or Tiffany Thomas Lopez's complaints.

505.   The MSU Defendants continued to hold Defendant Nassar out as a competent and safe physician.

506.   Additional complaints against Defendant Nassar surfaced in 2014. However,

- 102 -

because of Defendant MSU's culture, which included existence of a sexually hostile environment on Defendant MSU's campus and premises; and because of the University's failure to address complaints of sexual harassment, including sexual violence in a prompt and equitable manner, which in turn caused and may have contributed to a continuation of the sexually hostile environment, Defendant Nassar was permitted to continue employment and sexually abuse, assault, and molest Plaintiff and an unknown number of other individuals.[61]

507.   Between the time of the 2014 complaint and September 2016, the MSU Defendants continued to hold Defendant Nassar out as a competent and safe physician.

508.   Plaintiff relied on the assertions of the MSU Defendants.  She and many other Plaintiffs continued to seek treatment from Defendant Nassar in the wake of known concerns and dangers.

509.   Plaintiff was subjected to sexual assault, abuse, and molestation as a result of the MSU Defendants' fraudulent misrepresentations regarding Defendant Nassar.

510.   As a direct and/or proximate result of the MSU Defendants' fraudulent misrepresentations, Plaintiff suffered pain, discomfort, and will continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings

---

[61] *See Letter from U.S. Department of Education Office for Civil Rights to Michigan State University*, Sept. 1, 2015, OCR Docket #15-11-2098, #15-14-2113 *available at* https://www2.ed.gov/documents/press-releases/michigan-state-letter.pdf. (last visited July 16, 2018).

and earning capacity; and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

**N.  COUNT FOURTEEN**

**FAILURE TO REPORT CHILD ABUSE**
**MCL 722.621, et seq.**
**AGAINST DEFENDANTS KLAGES, KOVAN, AND STOLLAK**

511.  Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

512.  Michigan's Child Protection Law, MCL 722.621 *et seq.*, establishes mandatory reporting guidelines for suspected child abuse or neglect and provides penalties for failure to report child abuse or neglect.

513.  Specifically, MCL 722.623 provides in pertinent part:

> A physician, dentist, physician's assistant, registered dental hygienist, medical examiner, nurse, person licensed to provide emergency medical care, audiologist, psychologist, marriage and family therapist, licensed professional counselor, social worker, licensed master's social worker, licensed bachelor's social worker, registered social service technician, social service technician, a person employed in a professional capacity in any office of the friend of the court, school administrator, school counselor or teacher, law enforcement officer, member of the clergy, or regulated child care provider who has reasonable cause to suspect child abuse or child neglect shall make an immediate report to centralized intake by telephone, or, if available, through the online reporting system, of the suspected child abuse or child neglect.

514.  Child abuse is defined as "harm or threatened harm to a child's health or welfare that occurs through nonaccidental physical or mental injury, sexual abuse, sexual exploitation, or maltreatment, by a parent, a legal guardian, or any other person responsible for the child's health or welfare or by a teacher, a teacher's aide, or a member of the clergy." MCL 722.622(g).

- 104 -

515. Child neglect is defined as "harm or threatened harm to a child's health or welfare by a by a parent, a legal guardian, or any other person responsible for the child's health or welfare that occurs through either of the following: (*i*) Negligent treatment, including the failure to provide adequate food, clothing, shelter, or medical care. (*ii*) Placing a child at an unreasonable risk to the child's health or welfare by failure of the parent, legal guardian, or any other person responsible for the child's health or welfare to intervene to eliminate that risk when that person is able to do so and has, or should have, knowledge of the risk." MCL 722.622(k).

516. A person responsible for the child's health or welfare includes a nonparent. MCL 722.622(x).

517. Defendant Nassar was a non-parent adult who was responsible for Plaintiff's health and welfare, had substantial and regular contact with Plaintiff, had close relationships with many of minor patients' parents, and was not the Plaintiff's parent or a person otherwise related to the child. (MCL 722.622(v)).

518. Under MCL 722.633(1), "A person who is required by this act to report an instance of suspected child abuse or neglect and who fails to do so is civilly liable for the damages proximately caused by the failure."

519. Defendants Kovan (physician), Stollak (psychologist), and Klages (head coach/administrator), were mandatory reporters during the time Defendant Nassar was engaged in child abuse or child neglect. (MCL 722.622(g)).

520. As established in the allegations above, Defendants Kovan, Stollak, and Klages had reasonable cause to suspect child abuse or child neglect.

521. Defendants Kovan, Stollak, and Klages, had a duty to report any instances of

- 105 -

suspected child abuse or neglect and failed to report such abuse or neglect.

522.    Defendants Kovan, Stollak, and Klages, are or were employed by Defendants Michigan State University and Michigan State University Board of Trustees during the time Defendant Nassar was engaged in child abuse and child neglect, and were acting in the scope and course of their employment when they failed to report any instances of suspected child abuse or neglect.

523.    Defendants Klages, Kovan, and Stollak are directly civilly liable for the damages proximately caused by their failure to report any instances of suspected child abuse or neglect. Defendants Michigan State University and Michigan State University Board of Trustees are vicariously liable for said damages.

524.    As a direct and/or proximate result of the Defendants' actions and/or inactions, Plaintiff has suffered and continue to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity; and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

525.    In the alternative, the actions or inaction of the Defendants were so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff and

constitutes gross negligence that is the proximate cause of Plaintiff's damages. Plaintiff has suffered and continue to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity; and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

### VIII.   CLAIMS AGAINST USA GYMNASTICS (USAG) AND DEFENDANT NASSAR

526.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

527.   Defendant USAG owed Plaintiff and all other Plaintiffs that were members of Defendant USAG or participated in USAG sanctioned events a duty to use due care to ensure their safety and freedom from sexual assault, abuse, and molestation while interacting with Defendant USAG's employees, representatives, and/or agents.

**A.   COUNT FIFTEEN**

### GROSS NEGLIGENCE AGAINST DEFENDANT USAG AND DEFENDANT NASSAR

528.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

- 107 -

529.   Defendant USAG owed the Plaintiff a duty to use due care to ensure her safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, representatives, and/or agents.

530.   The above-named Plaintiff was a member of USAG, participated in USAG sanctioned events during the time she was treated by Defendant Nassar, and was referred to Defendant Nassar through USAG affiliations.

531.   Defendant Nassar owed the Plaintiff a duty to use due care in his capacity as an employee, representative, and/or agent of Defendant USAG.

532.   By seeking medical treatment from Defendant Nassar in his capacity as an employee, agent, and/or representative of Defendant USAG, a special, confidential, and fiduciary relationship between the Plaintiff and Defendant Nassar was created, resulting in Defendant Nassar owing Plaintiff a duty to use suitable and appropriate care.

533.   Defendant USAG's failure to adequately supervise Defendant Nassar was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff.

534.   Defendant Nassar's conduct in sexually assaulting, abusing, and molesting Plaintiff under the guise of rendering medical "treatment" as an employee, representative, and/or agent of Defendant USAG was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff.

535.   Defendant USAG's conduct demonstrated a willful disregard for necessary precautions to reasonably protect Plaintiff's safety.

536.   Defendant USAG's conduct as described above, demonstrated a willful disregard

for substantial risks to the Plaintiff.

537.   Defendant USAG breached its duties owed to Plaintiff and was grossly negligent when it conducted itself by actions described above, including but not limited to its failure to notify MSU about the reasons for Nassar's separation from USAG and more broadly the issues surrounding sexual abuse in gymnastics and warning signs and reporting requirements. Said acts were committed with reckless disregard for Plaintiff's health, safety, Constitutional and/or statutory rights, and with a substantial lack of concern as to whether an injury would result.

538.   As a direct and/or proximate result of Defendant USAG'S actions and/or inactions, Plaintiff suffered pain, discomfort, and will continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity; and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

**B.     COUNT SIXTEEN**

**NEGLIGENCE**
**AGAINST DEFENDANT USAG AND DEFENDANT NASSAR**

539.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

540.   Defendant USAG owed Plaintiff a duty of ordinary care to ensure her safety and freedom from sexual assault, abuse, and molestation while being treated by its employees, representatives, and agents.

541.   The Plaintiff as a member of Defendant USAG had a reasonable expectation that Defendant USAG was recommending competent and ethical physicians and trainers for medical treatment who would carry out said treatment without sexual assault, abuse, and molestation.

542.   By seeking medical treatment from Defendant Nassar in his capacity as an employee, agent, and/or representative of Defendant USAG, a special, confidential, and fiduciary relationship between the Plaintiff and Defendant Nassar and USAG was created, resulting in Defendant Nassar owing the aforementioned Plaintiff a duty to use ordinary care.

543.   Defendant Nassar owed the USAG Plaintiff a duty of ordinary care in carrying out medical treatment.

544.   Defendant USAG's failure to adequately train and supervise Defendant Nassar breached the duty of ordinary care.

545.   Defendant USAG's failure to properly investigate, address, and remedy complaints regarding Defendant Nassar's conduct was a breach of ordinary care.

546.   Defendant USAG's failure to inform the Plaintiff and the public of the allegations and concerns leading to Defendant Nassar's separation from USAG was a breach of ordinary care.

547.   Defendant Nassar's conduct in sexually assaulting, abusing, and molesting the Plaintiff was a breach of the duty to use ordinary care.

548.   As a direct and/or proximate result of Defendants' conduct, actions and/or inactions, the Plaintiff suffered pain, discomfort, and will continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, was prevented and

will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity; and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

## C.    COUNT SEVENTEEN

**VICARIOUS LIABILITY**
**AGAINST DEFENDANT USAG**

549.    Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

550.    Vicarious liability is indirect responsibility imposed by operation of law where an employer is bound to keep its employees within their proper bounds and is responsible if it fails to do so.

551.    Vicarious liability essentially creates agency between the principal and its agent, so that the principal is held to have done what the agent has done.

552.    Defendant USAG employed and/or held Defendant Nassar out to be its agent and/or representative from approximately 1986 to 2015.

553.    Defendant USAG is vicariously liable for the actions of Defendant Nassar as described above that were performed during the course of his employment, representation, or agency with Defendant USAG, during which time he had unfettered access to young female athletes.

554.    As a direct and/or proximate cause of Defendant Nassar's negligence carried out in the course of his employment, agency, and/or representation with Defendant USAG, Plaintiff

suffered pain, discomfort, and will continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, was prevented and will continue to be prevented from performing the Plaintiff's daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity; and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

**D.    COUNT EIGHTEEN**

**EXPRESS/IMPLIED AGENCY**
**AGAINST DEFENDANT USAG**

555.    Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

556.    An agent is a person who is authorized by another to act on the other's behalf.

557.    Defendant USAG intentionally or negligently made representations that Defendant Nassar was its employee, agent, and/or representative.

558.    On the basis of those representations, Plaintiff reasonably believed Defendant Nassar was acting as an employee, agent, and/or representative of Defendant USAG.

559.    Plaintiff was injured as a result of Defendant Nassar's sexual assault, abuse, and molestation as described above, carried out through his employment, agency, and/or representation with Defendant USAG.

560.    Plaintiff was  injured because she relied on Defendant USAG to provide employees or agents who would exercise reasonable skill and care, but Defendant USAG failed

to do so.

561.   As a direct and/or proximate cause of Defendant Nassar's negligence carried out in the course of his employment, agency, and/or representation with Defendant USAG, Plaintiff suffered pain, discomfort, and will continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life, and has sustained and continue to sustain loss of earnings and earning capacity; and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

**A.     COUNT NINETEEN**

**NEGLIGENT SUPERVISION
AGAINST DEFENDANT USAG**

562.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

563.   Defendant USAG had a duty to provide reasonable supervision of its employee, agent, and/or representative, Defendant Nassar, while he was in the course of his employment, agency and/or representation of Defendant USAG and while he interacted with young female athletes, including Plaintiff.

564.   It was reasonably foreseeable given the known sexual abuse in youth sports and gymnastics, and  in particular, that Defendant Nassar who had prior allegations against him had or would sexually abuse children, including Plaintiff, unless properly supervised.

- 113 -

565.   Defendant USAG by and through its employees, agents, managers and/or assigns such as Mr. Penny and Mr. Colarossi, knew or reasonably should have known of Defendant Nassar's conduct and/or that Defendant Nassar was an unfit employee, agent, and/or representative because of his sexual interest in children and young adults.

566.   Defendant USAG breached its duty to provide reasonable supervision of Defendant Nassar, and its failure permitted Defendant Nassar, who was in a position of trust and authority, to commit wrongful acts against Plaintiff.

567.   The aforementioned sexual abuse occurred while Defendant Nassar was acting in the course of his employment, agency and/or representation of Defendant USAG.

568.   Defendant USAG tolerated, authorized and/or permitted a custom, policy, practice or procedure of insufficient supervision and failed to adequately screen, counsel or discipline Defendant Nassar, with the result that Defendant Nassar was allowed to violate the rights of persons such as Plaintiff with impunity.

569.   As a direct and/or proximate result of Defendant USAG's negligent supervision, Plaintiff suffered pain, discomfort, and will continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity; and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

**B.      COUNT TWENTY**

### NEGLIGENT FAILURE TO WARN OR PROTECT
### AGAINST DEFENDANT USAG

570.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

571.   Given the direct or indirect knowledge of sexual abuse in youth sports and particularly in gymnastics, it was reasonably foreseeable that sexual abuse of minors may occur if proper procedures were not taken by Defendant USAG.

572.   Defendant USAG knew or should have known that Defendant Nassar posed a risk of harm to Plaintiff or those in Plaintiff's  situation.

573.   Defendant USAG had direct and/or constructive knowledge as to the dangerous conduct of Defendant Nassar and failed to act reasonably and responsibly in response to that knowledge.

574.   Defendant USAG knew or should have known that Defendant Nassar previously committed sexual assault, abuse, and molestation and/or was continuing to engage in such conduct.

575.   Defendant USAG had a duty to warn or protect Plaintiff and others in Plaintiff's situation against the risk of injury by Defendant Nassar.

576.   The duty to disclose this information arose by the special, trusting, confidential, and fiduciary relationship between Defendant Nassar in his capacity as employee, agent, and/or representative of Defendant USAG and the Plaintiff.

577.   Defendant USAG breached said duty by failing to warn the Plaintiff from

- 115 -

Defendant Nassar.

578.   Defendant USAG breached its duties to protect the Plaintiff  by failing to detect and/or uncover evidence of sexual abuse and sexual assault, investigate Defendant Nassar, adjudicate and suspend and/or ban Defendant Nassar from USAG affiliation and USAG sanctioned events.

579.   Defendant USAG failed to adequately screen, counsel and/or discipline Defendant Nassar for physical and/or mental conditions that might have rendered him unfit to discharge the duties and responsibilities of a physician in his capacity as an employee, agent, and/or representative of Defendant USAG, resulting in violations of Plaintiff's rights.

580.   Defendant USAG willfully refused to notify, give adequate warning, and implement appropriate safeguards to protect Plaintiff from Defendant Nassar's conduct.

581.   As a direct and/or proximate result of Defendant USAG's negligent failure to warn or protect, Plaintiff suffered pain, discomfort, and will continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life, and has sustained and continue to sustain loss of earnings and earning capacity; and will continue to require treatment, therapy and counseling to address the mental anguish and despair caused by Defendants' actions.

C.   **COUNT TWENTY-ONE**

**NEGLIGENT FAILURE TO TRAIN OR EDUCATE
AGAINST DEFENDANT USAG**

- 116 -

582.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

583.   Defendant USAG breached its duty to take reasonable protective measures to protect Plaintiff and other individuals from the risk of childhood sexual abuse and/or sexual assault by Defendant Nassar, such as the failure to properly train or educate Plaintiff and other individuals (including minors) about how to avoid such a risk.

584.   Defendant USAG failed to implement reasonable safeguards to:

    a.      Prevent acts of sexual assault, abuse, and molestation by Defendant Nassar;

    b.      Avoid placing Defendant Nassar in positions where he would have unsupervised contact and interaction with Plaintiff and other young athletes.

585.   As a direct and/or proximate result of Defendant USAG's negligent failure to train or educate, Plaintiff suffered pain, discomfort, and will continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity; and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

**D.**      **COUNT TWENTY-TWO**

**NEGLIGENT RETENTION**
**AGAINST DEFENDANT USAG**

586.   Plaintiff realleges and incorporates by reference the allegations contained in the

previous paragraphs.

587.   Defendant USAG had a duty when credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising employees, agents and/or representatives to exercise due care, but they failed to do so.

588.   Defendant USAG was negligent in the retention of Defendant Nassar as an employee, agent, and/or representative in its failure to adequately investigate, report, and address complaints about his conduct of which they knew or should have known.

589.   Defendant USAG was negligent in the retention of Defendant Nassar when after it discovered, or reasonably should have discovered Defendant Nassar's conduct, which reflected a propensity for sexual misconduct.

590.   Defendant USAG's failure to act in accordance with the standard of care resulted in Defendant Nassar gaining access to and sexually abusing and/or sexually assaulting Plaintiff as well as an unknown number of other individuals.

591.   The aforementioned negligence in the credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising of Defendant Nassar created a foreseeable risk of harm to Plaintiff as well as other minors and young adults.

592.   As a direct and/or proximate result of Defendant USAG's negligent retention, Plaintiff suffered pain, discomfort, and will continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning

capacity; and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

**E.      COUNT TWENTY-THREE**

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST DEFENDANT USAG

593.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

594.   Defendant USAG allowed Defendant Nassar to be in a position where he could sexually assault, abuse, and molest children and young adults.

595.   A reasonable person would not expect Defendant USAG to tolerate or permit their employee, agent, or representative to carry out sexual assault, abuse, or molestation.

596.   Defendant USAG held Defendant Nassar in high esteem and acclaim which in turn encouraged Plaintiff and others to respect and trust Defendant Nassar and seek out his services and to not question his methods or motives.

597.   Defendant USAG protected Defendant Nassar in part to bolster its national and international reputation in the gymnastics community.

598.   A reasonable person would not expect Defendant USAG to be incapable of supervising Defendant Nassar and/or preventing Defendant Nassar from committing acts of sexual assault, abuse and molestation.

599.   Defendant USAG's conduct as described above was intentional and/or reckless.

600.   As a direct and/or proximate result of Defendant USAG's conduct, the Plaintiff suffered pain, discomfort, and will continue to suffer pain of mind and body, shock, emotional

distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing the Plaintiff's daily activities and obtaining the full enjoyment of life, and has sustained and continue to sustain loss of earnings and earning capacity; and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

**F.      COUNT TWENTY-FOUR**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**AGAINST DEFENDANT USAG**

601.    Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

602.    Defendant USAG allowed Defendant Nassar to be in a position where he could sexually assault, abuse, and molest children and young adults.

603.    A reasonable person would not expect Defendant USAG to tolerate or permit their employee, agent, or representative to carry out sexual assault, abuse, or molestation.

604.    Defendant USAG held Defendant Nassar in high esteem and acclaim, which in turn encouraged Plaintiff and others to respect and trust Defendant Nassar and seek out his services and to not question his methods or motives.

605.    Defendant USAG protected Defendant Nassar in part to bolster its national and international reputation in the gymnastics community.

606.    A reasonable person would not expect Defendant USAG to be incapable of supervising Defendant Nassar and/or preventing Defendant Nassar from committing acts of

sexual assault, abuse and molestation.

607. Defendant USAG's conduct as described above was intentional and/or reckless.

608. As a direct and/or proximate result of Defendant USAG's conduct, the Plaintiff suffered pain, and continues to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing the Plaintiff's daily activities and obtaining the full enjoyment of life, and has sustained and continue to sustain loss of earnings and earning capacity; and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

**G.     COUNT TWENTY-FIVE**

**FRAUD AND MISREPRESENTATION
AGAINST DEFENDANT USAG**

609. Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

610. From approximately 1996 to summer 2015, Defendant USAG represented to Plaintiff and the public that Defendant Nassar was a competent, ethical, and safe physician.

611. By representing that Defendant Nassar was a team physician and athletic physician at Defendant MSU and a National Team Physician with Defendant USAG, Defendant USAG represented to Plaintiff and the public that Defendant Nassar was safe, trustworthy, of high moral and ethical repute, and that Plaintiff and the public need not worry about being harmed by Defendant Nassar.

- 121 -

612.   The representations were false when they were made as Defendant Nassar had and was continuing to sexually assault, abuse, and molest Plaintiff and an unknown number of other individuals.

613.   Additionally, complaints were made to Defendant USAG, yet Defendant USAG did not contact its members, including Plaintiff, the MSU Defendants, or any other clubs, or organizations affiliated with Defendant Nassar to inform them of the allegations and potential harm to Plaintiff and others.

614.  Plaintiff relied on the assertions of Defendant USAG.  Plaintiff and several additional Plaintiffs in this litigation continued to seek treatment of Defendant Nassar in the wake of concerns and dangers known to Defendant USAG.

615.   Plaintiff was subjected to sexual assault, abuse, and molestation as a result of Defendant USAG's fraudulent misrepresentations regarding Defendant Nassar.

616.  As a direct and/or proximate result of Defendant USAG's fraudulent misrepresentations, Plaintiff suffered pain, discomfort, and will continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; has  sustained and will continue to sustain loss of earnings and earning capacity;   and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

## IX.    CLAIMS AGAINST NASSAR

### A.    COUNT TWENTY-SIX

### ASSAULT AND BATTERY
### AGAINST DEFENDANT LAWRENCE NASSAR

617.    Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

618.    The acts committed by Defendant Nassar against Plaintiff described herein constitute assault and battery, actionable under the laws of Michigan.

619.    Defendant Nassar committed nonconsensual sexual acts which resulted in harmful or offensive contact with the body of Plaintiff.

620.    Specifically, Defendant Nassar committed acts which caused injury to Plaintiff by subjecting her to an imminent or actual battery and/or intentional invasions of her right to be free from offensive and harmful contact, and said conduct demonstrated that Defendant had a present ability to subject Plaintiff to an immediate, intentional, offensive and harmful touching.

621.    Defendant Nassar assaulted and battered Plaintiff by nonconsensual and unwanted digital vaginal penetration without notice or explanation of the "treatment".

622.    Plaintiff did not consent to the contact, which caused injury, damage, loss, and/or harm.

623.    As a direct and/or proximate result of Defendant Nassar's assault and battery, Plaintiff suffered discomfort, and will continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, was prevented and will

- 123 -

continue to be prevented from performing Plaintiff's  daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity; and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendant's actions.

**B.**      **COUNT TWENTY-SEVEN**

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### AGAINST DEFENDANT LAWRENCE NASSAR

624.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

625.   Defendant Nassar used his authority and position with Defendants MSU and USAG to sexually assault, abuse, and molest Plaintiff, and an unknown number of other individuals, including minors and young adults.

626.   Defendant Nassar, in committing acts of sexual assault, abuse, and molestation as described above under the guise of medical treatment, exhibited conduct that is extreme, outrageous and/or reckless in nature.

627.   A reasonable person would not expect their physician to sexually assault, abuse, or molest them, or to do so under the guise of medical "treatment" without proper notice or explanation, and without giving the patient the opportunity to refuse "treatment" of that nature.

628.   Defendant Nassar's conduct was intentional or reckless as he repeatedly sexually assaulted, abused, and molested multiple Plaintiffs over several years, from approximately 1996 to 2016, including Plaintiff.

629.   Defendant Nassar's conduct has caused and continues to cause Plaintiff to suffer

- 124 -

emotional and psychological distress.

630.   As a direct and/or proximate result of Defendant Nassar's outrageous conduct, Plaintiff suffered pain, discomfort, and will continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity; and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendant's actions.

## C.   COUNT TWENTY-EIGHT

### FRAUD AND MISREPRESENTATION
### AGAINST DEFENDANT LAWRENCE NASSAR

631.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

632.   From approximately 1990 to September 2016, Defendant Nassar represented to Plaintiff and the public that he was a competent, ethical, and safe physician.

633.   By representing that he was a team physician and athletic physician at Defendant MSU and a National Team Physician with Defendant USAG, Defendant Nassar represented to Plaintiff and the public that Defendant Nassar was safe, trustworthy, of high moral and ethical repute, and that Plaintiff and the public need not worry about being harmed by Defendant Nassar.

634.   The representations were false when they were made as Defendant Nassar had and

- 125 -

was continuing to sexually assault, abuse, and molest Plaintiff and an unknown number of individuals at MSU, Twistars' facilities, USAG meets, Defendant Nassar's home, and other locations.

635.   Specifically, Defendant Nassar's false representations include but are not limited to the following:

a.   making the statement, explaining, that his acts and/or conduct were a "new procedure" which involved vaginal penetration;

b.   making the statement, referring to his conduct, disguised as "treatment," as a pelvic adjustment;

c.   making the statement, explaining, that his acts and/or conduct was "checking your sternum";

d.   making the statement, explaining, that his acts and/or conduct was doing a "breast exam";

e.   making the statement, explaining, that his acts and/or conduct was "treatment" and that it was the same that he performed on Olympic athletes; and

f.   making a statement, explaining to a plaintiff and another medical professional that the position of his hand was in an appropriate place—when it was not— and while he was digitally penetrating the plaintiff, all which were made contemporaneously and/or shortly after the abrupt, sudden, quick, and unexpected sexual assaults by Defendant Nassar.

636.   The material representation(s) to Plaintiff were false, in that Defendant Nassar was actually engaging in conduct for his own sexual gratification and pleasure evidenced by his

observed arousal, flushed face, and closing of the eyes during the conduct.

637.   Plaintiff relied on the assertions of Defendant Nassar.  She and several other Plaintiffs continued to seek treatment by Defendant Nassar even after Defendant Nassar became aware of concerns and complaints regarding his "treatment."

638.   When Defendant Nassar made the material representation(s), he knew that they were false, in that he knew that the "treatment[s]" were not proper, appropriate, legitimate, and/or considered within standard of care by any physician of any specialty and/or sports therapist.

639.   Defendant Nassar made the material representation(s) with the intent that the material representation(s) should be acted and/or relied upon by Plaintiff such that Plaintiff:

   a.      should believe that the "treatments" were in fact "treatments";

   b.      should believe that the "treatment[s]" were proper, appropriate, and legitimate;

   c.      should not believe that she had been sexually assaulted;

   d.      should not believe that she had been sexually assaulted so that he could prevent discovery of his sexual assaults;

   e.      should continue the "treatment[s]" so that he could continue to sexually assault her; should not question and/or report the conduct to appropriate authorities; and,

   f.      should not reasonably believe and not be aware of a possible cause of action that she had against Defendant Nassar and/or other Defendants.

640.   Defendant Nassar concealed the fraud by an affirmative act(s) that was/were

- 127 -

designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that he:

  a. positioned himself in a manner in which parents or chaperones in the room could not see his conduct, so that he could conceal and prevent discovery of his conduct;

  b. dismissed a medical professional from the room, during an examination of a plaintiff who he was digitally penetrating, and who questioned the placement of his hands;

  c. prevented other medical professionals, chaperones, parents, guardians, and/or caregivers from being in the room during some examinations and treatments of Plaintiff so that he could sexually assault Plaintiff;

  d. did not abide by or follow the standard of care which requires another medical professional, chaperone, parent, guardian, and/or caregiver be in the room during the examination and treatment of minors and female patients; and

  e. did not abide by or follow restrictions that had been put into place in 2014 by Defendant MSU restricting his examination and treatment of patients only with another person in the room.

641. The actions and inactions of Defendant Nassar, as described in the preceding paragraphs, constituted Fraud.

642. Between the times of the 1997 complaint to MSU coaches and trainers, the 2000 complaint to MSU trainers, the 2004 complaint to Meridian Township Police, the 2014 Complaint to MSU officials, and September 2016 when he was fired, Defendant Nassar

- 128 -

continued to hold himself out as a competent and safe physician.

643.   Plaintiff was subjected to sexual assault, abuse, and molestation as a result of Defendant Nassar's' fraudulent misrepresentations.

644.   At all times pertinent to this action, Defendant Nassar was an agent, apparent agent, servant, and employee of the MSU Defendants and operated within the scope of his employment and his conduct is imputed to the MSU Defendants.

645.   At all times material hereto, Plaintiff was entirely free of any negligence contributing to the injuries and damages hereinafter alleged.

646.   As a direct and/or proximate result of Defendant Nassar's fraudulent misrepresentations, Plaintiff suffered discomfort, and will continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendant's actions.

## X.    DAMAGES - FOR ALL AFOREMENTIONED CAUSES OF ACTION

647.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

648.   As a direct and/or proximate result of Defendants' actions and/or inactions stated above, Plaintiff suffered pain, discomfort, and will continue to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of

self-esteem, disgrace, fright, grief, humiliation, and loss of enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and will continue to require treatment, therapy and counseling to address the mental anguish and despair caused by Defendants' actions.

649.   The conduct, actions and/or inactions of Defendants as alleged in the above stated counts and causes of action constitute violations of Plaintiff's constitutional and Federal rights as well as the common and/or statutory laws of the State of Michigan, and this Court has jurisdiction to hear and adjudicate said claims.

650.   In whole or in part, as a result of some or all of the above actions and/or inactions of Defendants, Plaintiff has and will continue to suffer irreparable harm as a result of the violations.

651.   The amount in controversy exceeds the jurisdictional minimum of $75,000.00.

**WHEREFORE**, Plaintiff requests this Court and the finder of fact to enter a Judgment in Plaintiff's favor against all named Defendants on all counts and claims as indicated above in an amount consistent with the proofs of trial, and seeks against Defendants all appropriate damages arising out of law, equity, and fact for each or all of the above counts where applicable and hereby requests that the trier of fact, be it judge or jury, award Plaintiff all applicable damages, including but not limited to compensatory, special, exemplary and/or punitive damages, in whatever amount the Plaintiff is entitled, and all other relief arising out of law, equity, and fact, also including but not limited to:

a)   Compensatory damages in an amount to be determined as fair and just under the circumstances, by the trier of fact including, but not limited to medical

expenses, loss of earnings, mental anguish, anxiety, humiliation, and embarrassment, violation of Plaintiff's constitutional, federal, and state rights, loss of social pleasure and enjoyment, and other damages to be proved;

b)      Punitive and/or exemplary damages in an amount to be determined as reasonable or just by the trier of fact;

c)      Reasonable attorney fees, interest, and costs; and,

d)      Other declaratory, equitable, and/or injunctive relief, including, but not limited to implementation of institutional reform and measures of accountability to ensure the safety and protection of young athletes and other individuals, as appears to be reasonable and just.

**Respectfully Submitted,**

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
Marc L. Newman (P51393)
The Miller Law Firm P.C.
Attorneys for Plaintiff
950 W. University Dr., Suite 300
Rochester, Michigan 48307
248-841-2200
240 652 2852 (fax)
epm@miller.law
mln@millerlawpc.com

*/s/ Robert C. Hilliard*
Robert C. Hilliard (TX 09677700)
Jessica J. Pritchett (TX 24102377)
Alexander Hilliard (TX 24099145)
HILLIARD MARTINEZ GONZALES, LLP
Attorneys for Plaintiff
719 S. Shoreline Boulevard
Corpus Christi, Texas 78401
361-882-1612
361-882-3015 (fax)
bobh@hmglawfirm.com
jpritchett@hmglawfirm.com
alex@hmglawfirm.com
*W.D. Michigan Admission Pending*

- 131 -

## JURY DEMAND

Plaintiff, by and through her attorneys Robert C. Hilliard, Jessica J. Pritchett, and Alexander Hilliard of Hilliard Martinez Gonzales LLP, and E. Powell Miller and Marc L. Newman of The Miller Law Firm, P.C., hereby demands a trial by jury on all claims set forth above.

/s/ E. Powell Miller
E. Powell Miller (P39487)
Marc L. Newman (P51393)
The Miller Law Firm, P.C.
Attorneys For Plaintiff
950 W. University Dr., Suite 300
Rochester, Michigan 48307
248-841-2200
248-652-2852
epm@miller.law
mln@millerlawpc.com

/s/ Robert C. Hilliard
Robert C. Hilliard (TX 09677700)
Jessica J. Pritchett (TX 24102377)
Alexander Hilliard (TX 24099145)
HILLIARD MARTINEZ GONZALES, LLP
Attorneys for Plaintiff
719 South Shoreline Blvd.
Corpus Christi, Texas 78401
361-882-1612
361-882-3015 (fax)
bobh@hmglawfirm.com
jpritchett@hmglawfirm.com
alex@hmglawfirm.com
*W.D. Michigan Admission Pending*